

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-09-00130-CV

MATLOCK PLACE APARTMENTS, L.P., JR TX 1, LLC, HAGOP KOFDARALI, INDIVIDUALLY, AND ROBBIE L. SEBERN BURNS, INDIVIDUALLY

APPELLANTS

V.

JEFFRY DRUCE, INDIVIDUALLY, AND AS TRUSTEE OF THE DRUCE FAMILY LIVING TRUST, AND JEFFRY DRUCE PROPERTIES, LLC

APPELLEES

----------

## FROM THE 96TH DISTRICT COURT OF TARRANT COUNTY

----------

## OPINION

----------

## I. Introduction

Appellants Matlock Place Apartments, L.P., JR TX 1, LLC, Hagop Kofdarali, Individually, and Robbie L. Sebern Burns, Individually appeal the trial

court's judgment rendered on a jury's verdict in favor of Appellee Jeffry Druce Properties, LLC (Druce Properties).[1]  Appellants contend in four issues and numerous sub-issues that the evidence is legally and factually insufficient to support the judgment, that the trial court erred by submitting two jury instructions, that the trial court abused its discretion by excluding relevant evidence concerning Druce Properties's damages, and that Druce Properties failed to properly segregate its attorney's fees.  We reverse and render in part and reverse and remand in part.

## II.  Background

### A. Parties

This appeal involves the Matlock Place Apartments in Arlington, Texas (the property).  Appellant Matlock Place is a single-asset, Texas limited partnership controlled by Appellant Hagop "Jack" Kofdarali.  Appellant JR TX 1, LLC is the general partner of Matlock Place.  Appellee Druce Properties purchased the property from Matlock Place in July 2004.

Kofdarali testified at trial that he had been buying, operating, and selling apartment complexes since 1993.  He assumed ownership responsibilities for the property in October 2002 when his sister purchased the property out of

---

[1]Jeffry Druce, Individually, and as Trustee of the Druce Family Living Trust, was also a plaintiff in the trial court, but the trial court granted a directed verdict against Druce in both capacities.  Druce has not appealed the trial court's directed verdict but was listed by the parties as an appellee in this court.

foreclosure for approximately $1.3 million,[2] and he retained Legend Asset Management Company (Legend) to manage the day-to-day tasks at the property.[3] Appellant Robbie Burns is the owner and president of Legend.

Jeffry Druce is the principal of Druce Properties. By the time Druce Properties purchased the property, Druce had been an actor, real estate agent, and real estate investor in California. Druce had owned or did own at the time of trial two rent houses, a home that he rehabilitated and sold, a sixteen-unit apartment complex, and a thirty-five-unit apartment complex. He also owned a large self-storage facility in south Texas. However, Druce testified that he had lived at the property during the three and one-half years before trial, managing the property himself and trying to turn it around.

## B. Matlock Place's History

When Kofdarali's sister purchased the property, the occupancy rate was between forty and fifty percent. Kofdarali testified that the property needed an occupancy rate in the eightieth percentile to sustain itself financially and that he believed bad management and lack of funds had caused the low occupancy rate. He also testified that apartment complexes of this type are challenging because tenant income is not as high, there is a lot of tenant turnover, and departing

---

[2]Kofdarali testified that his sister purchased the property because the selling bank required a quick closing with all cash.

[3]Legend was also a defendant in the trial court. However, the trial court severed the claims against Legend after Legend filed for bankruptcy. Legend is therefore not a party to this appeal.

3

tenants often leave the units damaged. Kofdarali testified that the property was in a high crime area, that the property was a "Class D" property or worse when he started looking at it, but that he was still interested because he might be able to clean it up and make it profitable.

Between October 2002 and August 2003, Kofdarali spent more than $500,000 rehabilitating the property by installing new exterior siding and replacing interior countertops, carpet, and appliances. In October 2003, Matlock Place obtained a loan for $1.8 million, and Kofdarali signed a personal guaranty for the loan. Kofdarali used the loan proceeds to pay his sister the $1.3 million purchase price and to reimburse himself $500,000 for rehabilitation costs and cash flow shortfalls. Kofdarali testified that he initially intended to completely rehabilitate the property but decided to sell it after learning how much a complete rehabilitation would cost.

Kofdarali decided in August 2003 to list the property for sale, and he retained Jeff Dowdle of the Marcus and Millichap firm as broker.[4] He knew that the broker would prepare, based on the information he provided, a marketing brochure to solicit interested buyers. Burns and Legend provided operating income and other information to Dowdle for preparation of the marketing brochure. Kofdarali testified that he expected readers to believe the brochure to be accurate as of the time it was created, and he agreed that the occupancy rate

---

[4]Kofdarali testified that he personally made the decision to sell even though his sister still owned the property at that time.

4

and the accuracy of the rent rolls, rental income, and property condition were important factors for a buyer. Kofdarali also testified that he approved the marketing brochure before Dowdle presented it to the public.

The brochure listed a ninety-three percent occupancy rate, and it stated that there was "very little deferred maintenance" and that "Major Rehab Just Completed." The brochure also included a disclaimer that stated, "The information contained herein is not a substitute for a thorough due diligence investigation." Kofdarali testified that occupancy rates fluctuate monthly and could go from ninety-three to eighty percent within one month. He also testified that rehabilitation was not complete at the time, and he denied that the brochure represented that all major rehabilitation was complete. Major rehabilitation other than the roof had been done, but a lot of interior units still needed work. Kofdarali also testified that he would never make a purchase decision based on a marketing brochure because they contain "fluff" intended to make the property look attractive to potential buyers. Referring to the marketing brochure, he said, "No one I know buys off of this."

Druce agreed that marketing brochures are advertising tools and contain exaggerations, but he testified that he still expected it to be truthful. He testified that the marketing brochure contained three materially false representations: that there was a ninety-three percent occupancy rate, that major rehabilitation was complete, and that only minimal deferred maintenance was required.

5

Druce was not the first prospective buyer to express interest in the property. Two other prospective buyers had signed contracts before Druce, but neither contract closed. Kofdarali testified that he assumed the buyers did not like what they saw upon conducting their due diligence inspections. Both contracts contained a due diligence clause, and Kofdarali testified that he removed the due diligence clause from the contract with Druce because the legal fees for negotiating a contract were too expensive since the buyer could back out after the due diligence period. He testified that instead of a due diligence clause in the sale contract itself, he began using letters of intent with a twenty-one day due diligence period.

## C. Letter of Intent and Due Diligence Period

Druce and Kofdarali signed a letter of intent on March 12, 2004. The purchase price in the letter of intent was $2.4 million, and the letter of intent included a twenty-one-day inspection period and a $100,000 credit at closing for "repairs and maintenance."

Druce testified that he personally inspected the property for about four hours after he had signed the letter of intent. Present at the inspection were Marcus and Millichap brokers Dowdle and John Barker and two female Legend employees. Burns arrived later. Druce testified that he asked to see a representative sample of the units and that he inspected approximately ten of the ninety-nine units. He testified that of the ten units he inspected, most were occupied, the vacant units had only minor damage, and none were uninhabitable.

6

Druce testified that he did not walk each of the ninety-nine units because the brochure represented that major rehabilitation had just been completed, because he thought the other units would look like those he had been shown, and because he was getting tired and bored. Druce admitted that he stopped the inspection and that Dowdle and the Legend employees would have shown him more units if he had wanted to see them, but he testified that he believed he was being shown a representative sample of the property.

Druce testified that he asked Dowdle at the inspection if there were any negatives that he needed to know about the property, that Dowdle told him there were not, and that he relied on that representation. He testified that no one disclosed to him that, contrary to the marketing brochure, rehabilitation was not complete, and he said he would have asked to see more units if that had been disclosed. Druce also testified that he relied on the statement in the marketing brochure about deferred maintenance and that he would not have purchased the property if its true condition had been disclosed; he said that it had been a major undertaking to make the property livable after he purchased it. But Druce acknowledged seeing problems with the foundation, roof, fence, and landscaping upon inspection and having received documents during due diligence that disclosed foundation and lighting problems.

The documents Druce received during the due diligence period were generated by Legend, and Kofdarali agreed that they were presented to Druce as complete and accurate. Druce acknowledged receiving 1,500 to 2,000 pages of

7

documents, but he testified that he did not notice the crime and delinquent rent problems revealed by the documents and that were pointed out to him at trial. Druce testified that he would have been concerned about the high delinquent rent and prostitution problems pointed out to him at trial, and he agreed that no one had refused any request for information or access to a unit and that he would have been aware of this information had he completely reviewed the due diligence documents. Druce testified, however, that the information was "buried" in the stack of paper and that he did not consider that to be full disclosure. He testified that he should have been provided a single document containing negative disclosures on it. Druce also testified that it is "worthless" to receive documentation with inaccurate income and occupancy numbers.

Druce acknowledged that a buyer must conduct due diligence before purchasing a property and testified that due diligence is more important than the information in the brochure. He testified that a limitation of the seller's representations in a marketing brochure or sale contract does not cause him concern and that, in his opinion, the limitation of the seller's representations does not mean the buyer cannot trust the information the seller provides. Druce agreed that the buyer should independently investigate the property, and he acknowledged that he walked the property and received documentation. Druce also agreed that the occupancy rates shown on the rent rolls he received showed that the occupancy rate was no longer ninety-three percent as represented in the marketing brochure.

**D. Sale Contract and Closing**

Druce and Kofdarali entered into the "Contract of Sale" (the contract) on March 24, 2004. Although the letter of intent provided for a twenty-one day due diligence period, Druce signed the contract twelve days after signing the letter of intent. Druce insisted that the roof be repaired before closing, and Druce and Kofdarali agreed to split the cost of the new roof with Kofdarali paying his half of the new roof cost by lowering the purchase price. Thus, Druce purchased the property for $2.273 million. According to Kofdarali, this amount reflected a purchase price of $2.4 million, a $100,000 credit for maintenance and repairs, and a $27,000 credit for half of the cost of the new roof. Kofdarali testified that Druce negotiated for the $100,000 credit "because he knew that there was work to be done on this property." Druce, however, testified that he made a $2.3 million offer that Kofdarali accepted without negotiation and that he did not know where the $100,000 credit came from. Kofdarali received $365,484.94 from the sale at closing but testified that he made no profit on the sale to Druce.

Druce closed on the property in late July 2004. He testified that he visited the property four or five days before closing and that the property looked deserted. During that visit, he learned from an Arlington police officer that the property was well known in the area for its crime problem and that the property was full of drug dealers, addicts, and prostitutes. Druce testified that no one had disclosed the crime problem to him but testified that he closed on the property anyway because he was financially and emotionally invested in it. Druce testified

9

that he was still excited about the property because the income stream as represented was "gigantic" and that he thought the income stream would be even higher once he cleaned up the crime problem.

Druce acknowledged receiving documents just before closing that showed the occupancy rate at eighty-seven rather than ninety-three percent, but he testified that he still believed the marketing brochure to be "substantially true" because the income stream would have still been significant. He testified that he would not have closed had he believed the updated information was not true, but he admitted that he did not go inside any units to verify the occupancy rate when he visited the property just before closing.

Kofdarali testified that Druce received documents at closing, including rent rolls and operating reports, that reflected $12,000 in delinquent rent.[5] Kofdarali acknowledged, however, that he did not personally verify the information provided to Druce, and he agreed that a buyer would want to know if twelve to fifteen percent of the units were uninhabitable. Kofdarali denied making any representations to Druce about the number of down units and testified that he did not know the number of down units at closing or how Druce defined a down unit.[6]

---

[5]Druce did not dispute receiving and having an opportunity to review the documents exchanged at closing.

[6]Kofdarali testified that a down unit is uninhabitable and "requires just about everything: carpet, appliances, cabinets, plumbing, doors." Druce testified that a down unit is one that cannot be lived in and requires more than relatively minor repairs.

## E. Accuracy of Documentation

Rosemary Ocampo began working at the property for Legend shortly before Druce offered to buy it, and she testified that she was the property manager when Druce Properties purchased the property. Ocampo testified that Legend employee Christina Morrison told her not to remove tenants from the computer system when they moved out and to only add tenants to the computer system because the property was for sale. Ocampo testified on cross-examination, however, that she did not know how to use the rent roll program and could not have changed the tenant numbers if she had wanted to. Ocampo also testified that Morrison told her to accept every tenant application at the property without conducting criminal or credit checks because, according to Morrison, they could not show any vacant units due to the pending sale. Ocampo testified, "We needed to fill the property up, so any application that came to the door, we had to move them in."

Ocampo testified that she was aware of the crime problem at the property before Druce purchased it and that she ultimately stopped working at the property because of the crime problem.[7] When she left, she called Morrison and asked for a job with Legend at another property. When asked why she would have worked for Legend again if they had allegedly falsified documents, she

---

[7]There was a murder on the property five months after Druce purchased it.

testified that she did not realize what Legend had done until she was contacted by lawyers several years later.

Morrison testified that Ocampo was in fact trained to run the rent roll computer program and knew how to add and remove tenants from the rent roll. Morrison also testified that there is a difference between accepting all applications and moving in all applicants. Apartment complexes cannot discriminate, so they accept all applications that are given to them but exercise discretion on which tenants to lease to after verifying the information on the rental application. Morrison denied telling Ocampo to falsify documentation, to fill the property with tenants without conducting background checks, or to not remove tenants from the rent roll when they moved out, and she testified that not removing tenants from the rent roll creates a high delinquency rate and causes the income numbers to look bad. Morrison also denied being told to not remove tenants from rent rolls and said she would have quit working for Legend if she had been so instructed.

Morrison acknowledged, however, that a comparison of the rent rolls, delinquency reports, and manager's reports from September through November 2003 revealed drastic inconsistencies within the same month. For example, the September 2003 rent roll listed twelve units as occupied when the September 2003 delinquency report showed that none of those twelve units was occupied and that some of those tenants had moved out five months earlier. Many of the same inconsistencies existed in the October and November 2003 reports. The

November 2003 rent roll listed ten vacant units while a November 2003 manager's report listed eighteen vacant units. Morrison admitted that these delinquency reports, rent rolls, and manager's reports were among the documents Druce received during due diligence.

Burns, Legend's president, testified that Legend's policy was to conduct criminal and credit background checks and that she did not instruct anyone not to check tenant backgrounds. Burns also testified that tenants are automatically added or taken off of the rent rolls by the computer system when they move in or out and that no one asked her or Legend to falsify documentation or to run the property differently after Druce signed the contract.[8] Kofdarali similarly testified that it is "stupid" to not take tenants off the rent roll as they move out because it shows up as money or rent owed but not collected, and he testified that he never instructed anyone to falsify any documents.

Druce testified that he would not have purchased the property had he known that the rent rolls were inaccurate or that tenants had been allowed to live on the property without any background checks. He testified that the only reason to allow bad tenants onto the property is to raise the occupancy rate to sell it and that he would not do that to someone else. Druce said that inaccurate documents prevent prospective buyers from making an informed, intelligent

---

[8]Burns testified that Legend was paid a percentage of actual collections, not a percentage of forecasted income, for serving as property manager and that Legend received more money if the property collected more rent. She also testified that Legend did not receive any compensation from the sale to Druce.

13

purchase decision and that Legend's actions made the property worthless by representing that the property was making money when it was not. Druce testified that he believes the documents he received had been falsified because of Ocampo's testimony and because he had not been able during his ownership to duplicate the income levels represented to him before closing. Druce also believed that it was a breach of the contract to provide him with false documents at closing.

## F. Druce Properties's Ownership

Ocampo stayed at the property after Druce Properties purchased it to serve as property manager for Majestic Realty Management, Druce Properties's new management company. She testified that she walked the entire property with her supervisor within a week of closing, that there were twelve down units and a total of twenty-five to thirty vacant units, and that the rent roll Druce received at closing did not match what they saw. Burns denied there were that many down units when Druce Properties purchased the property, but she acknowledged that it had been a long time since she had walked all of the units. Dowdle, the Marcus and Millichap broker who represented Kofdarali, testified that he had walked all but four or five of the units with another prospective buyer just before Druce decided to buy it, that there were not twelve to fifteen down units at that time, and that Ocampo's testimony could not be correct because there could not have been that much change in only a few months.

Druce testified that he learned from his property manager that there were sixteen uninhabitable units at closing.  He also testified that his first two property management companies quit and that he was continually asked to send money to cover operating expense shortfalls.  Druce testified that he did not initially send all the money requested by his management companies because he did not believe that the property could be suffering financially to that degree.  Druce defaulted on the mortgage in November or December 2004 and eventually worked out the problems with the mortgage company, but he testified that he had personally lived at the property for the three and one-half years before trial, aggressively managing and trying to turn around the property.

Druce testified that the occupancy rates during his ownership have fluctuated between seventy-eight and fifty-eight percent.  He also testified that the physical condition of the property was much better at the time of trial but that the property was still losing money.  The crime problem had improved through diligently investigating tenants before they lease and seeking eviction when they default.  Druce testified that he had spent approximately $800,000 rehabilitating the property, all in an effort to get the property to at least break even and that he would not have purchased the property had he known its true condition.

## G.  Damages and Attorney's Fees

James Ryfell, a commercial real estate investor and developer, testified as an expert witness for Druce Properties.  Ryfell testified that the property had a market value in 2004 between $1 and $1.1 million.  Druce testified without

15

objection that the property was worth approximately $1 million when he purchased it. He based his opinion on the amount of deferred maintenance required and deducted that number from Kofdarali's $1.3 million purchase price from 2002. Druce later said that the property was worth $1 million when he purchased it because Kofdarali had filled it with criminals after purchasing it for $1.3 million. Druce admitted on cross-examination, however, that his $1 million estimated value was actually based on his expert's opinion and that he had not protested the significantly higher tax appraisal by Tarrant County.

There was also evidence that Druce Properties listed the property for sale in 2007 for $2.75 million and that Druce received multiple offers at $2.4 or $2.5 million. Druce testified, however, that the offers were based on creative financing arrangements he was not comfortable with and that he fired his broker based on misrepresentations contained in the marketing brochure.[9]

## H. Jury Verdict

At the close of all evidence, the jury returned a verdict for Druce Properties, finding that Kofdarali, Matlock Place, Legend, and Burns committed fraud by nondisclosure and statutory fraud; that Kofdarali, Matlock Place, Legend, and Burns made a negligent misrepresentation upon which Druce Properties relied; and that Matlock Place breached the contract. The jury found that Druce Properties sustained damages of $973,900 and that Druce Properties

_____

[9]Druce's broker, Clifford Stratton, testified that Druce reviewed, edited, and approved the brochure before it was shown to the public.

should recover $146,153 in trial attorney's fees. The jury also assessed punitive damages of $1.3 million against Legend. The trial court subsequently signed a judgment in accordance with the jury's verdict.

## III. Sufficiency of the Evidence

Appellants globally contend in their first issue that the evidence is legally and factually insufficient to support the trial court's judgment. We address each of Appellants' sub-issues in turn.

## A. Standards of Review

### 1. Legal Sufficiency

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228

S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex. 2002). Any ultimate fact may be proved by circumstantial evidence. *Russell v. Russell*, 865 S.W.2d 929, 933 (Tex. 1993). A fact is established by circumstantial evidence when the fact may be fairly and reasonably inferred from other facts proved in the case. *Id.* However, to withstand a legal sufficiency challenge, circumstantial evidence still must consist of more than a scintilla. *Blount v. Bordens, Inc.*, 910 S.W.2d 931, 933 (Tex. 1995).

### 2. Factual Sufficiency

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986)

(op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

**B. Damages**

Appellants argue in part of their first issue that the evidence of Druce Properties's damages is insufficient because it is conclusory and not supported by any calculation or methodology. The jury charge asked the jury to find the difference between the value of the property as represented and the value of the property as received, and the jury found the difference to be $973,900. Appellants challenge both the evidence of value as represented and the evidence of value as received.

Appellants first argue that there is no evidence or factually insufficient evidence they represented the property had a particular market value and that the "only evidence was that Matlock [Place] merely sought a particular price." However, the August 2003 marketing brochure listed an asking price of $2.5 million, and it further represented that the property had a ninety-three percent occupancy rate, annual income of $624,120, and an annual total return before taxes of $155,597. Dowdle testified that the numbers in the brochure were intended to advise a potential buyer how to determine the property's value, that the brochure was a representation about how to calculate the property's value, and that the "numbers were intended to represent that the 2.5 million dollar asking price was a fair price." From this evidence, the jury could have reasonably determined that the property's value as represented was $2.5 million.

Appellants also argue there is no evidence or factually insufficient evidence of the property's market value as received by Druce Properties in 2004 because the only evidence offered was conclusory ipse dixit testimony. Ryfell testified that he has purchased and sold twenty-five to thirty apartment complexes. He first identified several items that he evaluates when considering the purchase of a Class C property: whether the roof is flat or pitched, whether the units have individual electricity meters and water heaters, whether the stairways are covered or exposed, and whether the air conditioning units are installed in a way that makes them subject to theft. Ryfell testified that he next reviews the income-expense and rent roll documentation to compare against his initial assessment of the property.

Ryfell testified that, in his opinion, the property had a market value between $1 and $1.1 million in 2004, depending on the integrity of the roof and whether the air conditioning units were all working. To support his opinion, Ryfell testified that he reviewed the operating numbers and rent roll after the sale date and applied "basic fundamental assumptions of valuation analysis." Ryfell explained that by "basic fundamental assumptions," he meant (1) determining gross rent; (2) deducting (a) twenty percent for maintenance; (b) twelve percent for funds in reserve; and (c) actual expenses such as insurance, employee salaries, and utilities; and (3) applying a reasonable capitalization rate to the resulting number. Ryfell testified that he used Druce Properties's operating statements from after the sale to determine the income and expenses and that

20

he calculated the property's value to be $1 million. Thus, Ryfell identified for the jury the physical and financial aspects of the property that he considered important in determining its value, and he provided the jury with his calculation, the source of the numbers inputted into his calculation, and the result of his calculation. We hold that Ryfell's testimony concerning property value as received is not conclusory. *See Plunkett v. Conn. Gen. Life Ins. Co.*, 285 S.W.3d 106, 120 (Tex. App.—Dallas 2009, pet. denied) ("'A conclusory statement is one that does not provide the underlying facts to support the conclusion.'") (quoting *Brown v. Brown*, 145 S.W.3d 745, 751 (Tex. App.—Dallas 2004, pet. denied)). And to the extent that Appellants contend that Ryfell's testimony is no evidence of damages because it was based on assumed facts that differed from actual, undisputed facts, Ryfell testified that his calculations and market value determination were based on the actual documentation generated by Druce Properties shortly after it purchased the property from Matlock Place. His testimony was not based on assumed facts. After applying the appropriate standards of review, we hold that legally and factually sufficient evidence supports the jury's damage award. *See Gulf States Util. Co. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002) (stating that the fact finder "has discretion to award damages within the range of evidence presented at trial"); *Norris v. Jackson*, No. 02-09-00265-CV, 2010 WL 4261541, at *5–6 (Tex. App.—Fort Worth Oct. 28, 2010, no pet.) (mem. op.) (affirming damage award within range of evidence

21

presented at trial on legal and factual sufficiency grounds). We overrule this portion of Appellant's first issue.

## C. Disclaimer of Reliance

Appellants contend in part of their first issue that the evidence is legally insufficient to support Druce Properties's fraud, statutory fraud, and negligent misrepresentation claims because the disclaimer of reliance clause in the contract negated Druce Properties's reliance as a matter of law, thereby conclusively negating reliance as an essential element of each cause of action.[10]

### 1. Applicable Law

The Texas Supreme Court has addressed the enforceability of disclaimer of reliance clauses on at least three occasions. *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323 (Tex. 2011); *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51 (Tex. 2008); *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171 (Tex. 1987). "The question of whether an adequate disclaimer of reliance exists is a matter of law." *Italian Cowboy*, 341 S.W.3d at 333 (citing *Schlumberger*, 959 S.W.2d at 181).

The *Schlumberger* court upheld a disclaimer of reliance clause and determined that there was a clear intent to disclaim reliance where the contract provided, "[N]one of us is relying upon any statement or representation by any

---

[10]Appellants preserved this issue by motion for directed verdict and motion for judgment notwithstanding the verdict, both of which were denied by the trial court.

agent of the parties being released hereby. Each of us is relying on his or her own judgment." 959 S.W.2d at 180. The court emphasized that the principle that fraud vitiates a contract must be weighed against the competing concern that parties should be able to fully and finally resolve their disputes by bargaining for and executing a release barring all further disputes. *Id.* at 179. Based on this latter concern, the court held that "a release that clearly expresses the parties' intent to waive fraudulent inducement claims, or one that disclaims reliance on representations about specific matters in dispute, can preclude a claim of fraudulent inducement." *Id.* at 181. The court further remarked, however, that a disclaimer will not always preclude a fraudulent inducement claim. *Id.*

Later, in *Forest Oil*, the court upheld a similar disclaimer of reliance clause that stated in part, "[N]one of [the Plaintiffs and Intervenors] is relying upon any statement or any representation of any agent of the parties being released hereby. Each of the Plaintiffs and Intervenors is relying on his, her, or its own judgment." *See* 268 S.W.3d at 54 n.4. The court identified five facts that it had considered most relevant in *Schlumberger* and that were also present in *Forest Oil*, and the Court listed those facts as:

> (1) the terms of the contract were negotiated, rather than boilerplate, and during negotiations, the parties specifically discussed the issue which has become the topic of the subsequent dispute;
>
> (2) the complaining party was represented by counsel;
>
> (3) the parties dealt with each other in an arm's length transaction;
>
> (4) the parties were knowledgeable in business matters; and

23

(5) the release language was clear.

*Id.* at 60.

The *Forest Oil* court, however, expressly declined to adopt "a *per se* rule that a disclaimer automatically precludes a fraudulent-inducement claim" and stated that its holding "should not be construed to mean that a mere disclaimer standing alone will forgive intentional lies regardless of context." *Id.* at 61.

Subsequently, in *Italian Cowboy*, the court restated the factors and indicated that if a clear and unequivocal disclaimer of reliance clause is determined to exist, the analysis then proceeds to the factors that consider the circumstances surrounding the contract's formation to determine whether the provision is binding. *See* 341 S.W.3d at 337 n.8. The clause at issue in *Italian Cowboy* stated, "Tenant acknowledges that neither Landlord nor Landlord's agents, employees or contractors have made any representations or promises . . . except as expressly set forth herein." *Id.* at 336. The court held that the clause was actually nothing more than a standard merger clause and that if the parties had actually intended to disclaim reliance, they did not do so by clear and unequivocal contractual language. *See* 341 S.W.3d at 333–34, 336. The court held that the contractual clause did not bar Italian Cowboy's claim for fraudulent inducement because the clause did not meet the elevated requirement of disclaiming reliance on representations in "clear and unequivocal language." *See id.* at 336. And because the parties' contract did not clearly and

unequivocally disclaim reliance, the court did not consider the remaining *Forest Oil* factors. *See id.* at 337 n.8.

## 2. Discussion

The disclaimer of reliance clause at issue here stated in bold and capital type:

> 9. LIMITATIONS OF SELLER'S REPRESENTATIONS AND WARRANTIES
>
> EXCEPT AS OTHERWISE SPECIFICALLY STATED IN THIS CONTRACT, *SELLER HEREBY SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY OR REPRESENTATION*, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, OR CONCERNING (I) THE NATURE AND CONDITION OF THE PROPERTY, INCLUDING WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, AND THE SUITABILITY THEREOF AND OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH BUYER MAY ELECT TO CONDUCT THEREON, AND THE EXISTENCE OF ANY ENVIRONMENTAL HAZARDS OR CONDITIONS THEREON (INCLUDING THE PRESENCE OF ASBESTOS) OR COMPLIANCE WITH ALL APPLICABLE LAWS, RULES OR REGULATIONS; (II) EXCEPT FOR ANY WARRANTIES CONTAINED IN THE DEED TO BE DELIVERED BY SELLER AT THE CLOSING, THE NATURE AND EXTENT OF ANY RIGHT-OF-WAY, LEASE, POSSESSION, LIEN, ENCUMBRANCE, LICENSE, RESERVATION, CONDITION OR OTHERWISE; AND (III) THE COMPLIANCE OF THE PROPERTY OR ITS OPERATION WITH ANY LAWS, ORDINANCES OR REGULATIONS OF ANY GOVERNMENT OR OTHER BODY.[11] *BUYER ACKNOWLEDGES THAT IT WILL INSPECT THE PROPERTY AND BUYER WILL RELY SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY SELLER. BUYER FURTHER*

---

[11]Druce Properties argues there is a comma rather than a period after "other body," but a review of the best available copy and a comparison to Matlock Place's contract with a previous potential buyer confirm that the punctuation mark is actually a period.

*ACKNOWLEDGES THAT THE INFORMATION PROVIDED AND TO BE PROVIDED WITH RESPECT TO THE PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND SELLER (I) HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION; AND (II) DOES NOT MAKE ANY REPRESENTATIONS AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION.* THE SALE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN "AS IS" BASIS, AND BUYER EXPRESSLY ACKNOWLEDGES THAT, IN CONSIDERATION OF THE AGREEMENTS OF SELLER HEREIN, EXCEPT AS OTHERWISE SPECIFIED HEREIN, SELLER MAKES NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF CONDITION, HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, IN RESPECT OF THE PROPERTY. [Emphasis added.]

Because the disclaimer of reliance clause must clearly and unequivocally disclaim reliance, we begin with the fifth *Forest Oil* factor. *See id.* (listing remaining factors that become relevant if the contract clearly and unequivocally disclaims reliance).

The clause at issue in *Forest Oil* stated in part that the parties were not "relying upon any statement or any representation of any agent of the parties being released" and that they were each "relying on his, her, or its own judgment." *See* 268 S.W.3d at 54 n.4. The clause at issue in *Schlumberger* stated in part that "none of us is relying upon any statement or representation by any agent of the parties being released hereby" and that "[e]ach of us is relying on his or her own judgment." 959 S.W.2d at 180. The clause at issue here disclaimed any representations concerning the condition of the property or the accuracy or completeness of any information provided to Druce Properties, and

the clause expressly provided that Druce Properties would "inspect the property" and would "rely solely on its own investigation of the property and not on any information provided or to be provided by seller." We hold that the language of the clause clearly and unequivocally disclaimed Druce Properties's reliance. *See Forest Oil*, 268 S.W.3d at 60, 62; *Schlumberger*, 959 S.W.2d at 179, 180–81; *cf. Allen v. Devon Energy Holdings, L.L.C.*, No. 01-09-00643-CV, 2011 WL 3208234, at *7–9 (Tex. App.—Houston [1st Dist.] July 28, 2011, no pet. h.) (holding fraudulent inducement claim not precluded because contract did not negate reliance on information provided by other party).

We now consider the remaining *Forest Oil* factors. The first factor inquires whether the terms of the contract were negotiated and whether the parties specifically discussed the issues that later became the topic of the dispute. *See Forest Oil*, 268 S.W.3d at 60. Druce Properties argues that the contract language was boilerplate and not negotiated because it appeared in a previous Matlock Place contract and that there was not a dispute between the parties at the time of contract formation. While Matlock Place's contract with the prior interested buyer did contain an identical disclaimer of reliance clause, there is evidence that the parties specifically discussed and negotiated contractual terms to address one of the primary topics disputed at trial: the required maintenance and repair of the property. Druce and Kofdarali spoke on the telephone before closing and agreed to split the cost of a new roof, and Kofdarali's share of the roof cost was deducted from the final sale price. Moreover, the letter of intent set

27

forth a $100,000 credit at closing for "repairs and maintenance," and Kofdarali testified that Druce negotiated for the $100,000 credit "because he knew that there was work to be done on this property."[12]   Thus, although some of the evidence is conflicting, the parties specifically discussed and negotiated the issue of the property's need for repairs and maintenance when arranging for the sale of the property.   Thus, on balance, the first *Forest Oil* factor favors enforcement. *Compare Baker v. City of Robinson*, 305 S.W.3d 783, 796 (Tex. App.—Waco 2009, pet. denied) (declining to enforce disclaimer of reliance clause and noting that only purchase price was negotiated in parties' contract), *with Worldwide Asset Purchasing, L.L.C. v. Rent-A-Center East, Inc.*, 290 S.W.3d 554, 567–68 (Tex. App.—Dallas 2009, no pet.) (enforcing disclaimer of reliance clause and noting summary judgment evidence reflected parties exchanged proposed drafts).

Concerning representation by counsel, it does not appear that Druce had an attorney assist with the negotiation of the letter of intent or the contract, but Druce did obtain, four months after signing the contract, an attorney's opinion letter concerning the loan for the property.   Thus, there is conflicting evidence concerning Druce's representation by counsel.   *Compare Baker*, 305 S.W.3d at 796 (declining to enforce disclaimer of reliance clause and noting plaintiff's

---

[12]As set forth in the factual background section, Kofdarali and Druce gave conflicting testimony about negotiating the maintenance and repair credit in the letter of intent.

testimony that "he was not represented by counsel during the bidding process or at closing"), *with RAS Group, Inc. v. Rent-A-Center East, Inc.*, 335 S.W.3d 630, 640 (Tex. App.—Dallas 2010, no pet.) (enforcing disclaimer of reliance clause and noting testimony that parties had attorneys available to review contract).

Druce Properties concedes the third factor, which inquires whether the parties dealt with one another in an arm's length transaction, and the fourth factor, the parties' knowledge in business matters, favors enforcement. Druce had been a real estate agent for twenty years and had closed over one hundred properties for clients, he took a fee for serving as an agent in this transaction, and he owned two small apartment complexes and a large storage facility when he entered into the contract. Although Druce did not have experience with large apartment complexes equivalent to Kofdarali's, he did have experience sufficient to be considered knowledgeable in business matters, particularly those involving real estate.

Considering the *Forest Oil* factors and the policy reasons for the holdings in *Forest Oil* and *Schlumberger*, we hold that the disclaimer of reliance clause in the purchase and sale contract precludes Druce Properties's reliance as a matter of law. The contract provides that Druce Properties would rely solely upon its own investigation and that Matlock Place had not verified any of the information provided, and at least three of the other four factors weigh in favor of enforcing the disclaimer of reliance clause. *See McLernon v. Dynegy, Inc.*, 347 S.W.3d 315, 332–33 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (enforcing

29

disclaimer of reliance clause with only "scant" evidence of extent of representation by counsel and stating that the *Forest Oil* considerations are factors rather than elements). Under the facts of this case, we hold that the disclaimer of reliance clause is enforceable and that it precludes Druce Properties's fraud by nondisclosure, statutory fraud, and negligent misrepresentation claims against Matlock Place as a matter of law.[13] *See Forest Oil*, 268 S.W.3d at 60–61; *see also Schlumberger*, 959 S.W.2d at 181 (holding statutory fraud and fraud by nondisclosure claims barred by disclaimer of reliance clause); *RAS Group, Inc.*, 335 S.W.3d at 640 (holding negligent misrepresentation claim barred by disclaimer of reliance clause). We sustain this portion of Appellants' first issue.

## D. Justifiable Reliance

Appellants next argue there is legally insufficient evidence of Druce Properties's reliance because "Druce knew sufficient information before signing the contract and closing to not justifiably rely on the information in the brochure

---

[13]By our holding, we necessarily disagree with Druce Properties's implication that a disclaimer of reliance clause is enforceable only if it is contained in a settlement agreement. In *Italian Cowboy*, the Supreme Court addressed the disclaimer of reliance clause argument as it related to a restaurant lease agreement. *See* 341 S.W.3d at 331–37. Moreover, courts of appeal have not limited the application of disclaimer of reliance clauses to settlement agreements. *See RAS Group, Inc.*, 335 S.W.3d at 633 (contract for purchase of delinquent credit accounts); *Baker*, 305 S.W.3d at 786 (contract for sale of real property); *Worldwide Asset Purchasing, L.L.C.*, 290 S.W.3d at 567–69 (contract for purchase of delinquent credit accounts); *see also Allen*, 2011 WL 3208234, at *2–4 (stock redemption agreement).

and complained-of documents."[14]  Reliance is a necessary element of Druce Properties's statutory fraud claim against Appellants.  *See* Tex. Bus. & Com. Code Ann. § 27.01(a)(1)(B), (2)(D) (West 2009) (listing reliance as element of statutory fraud).  We assume without deciding that Druce Properties's reliance must have been justifiable.  *See Tex. First Nat'l Bank v. Ng*, 167 S.W.3d 842, 856 n.24 (Tex. App.—Houston [14th Dist.] 2005, pet. granted, judgm't vacated w.r.m.) (noting "disagreement among Texas courts as to whether reliance on fraudulent misrepresentation must be justifiable").

"In measuring justifiability, we must inquire whether, 'given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud[,] it is extremely unlikely that there is actual reliance on the plaintiff's part.'"  *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010) (quoting *Haralson v. E.F. Hutton Group, Inc.*, 919 F.2d 1014, 1026 (5th Cir. 1990)).  In other words, a person may not justifiably rely on a representation if there are "red flags" indicating such reliance is unwarranted.  *Id.* (quoting *Lewis v. Bank of Am. NA*, 343 F.3d 540, 546 (5th Cir. 2003)).

---

[14]Appellants do not challenge Druce Properties's reliance on factual sufficiency grounds.  Furthermore, because we have held that the disclaimer of reliance clause is enforceable in favor of Matlock Place, the following discussion of Druce Properties's misrepresentation claims relates only to Kofdarali and Burns.

Appellants point to several representations that Druce Properties contends were false, and they also identify evidence suggesting that Druce was aware of the falsity before closing. For example, Appellants note that the marketing brochure and September 2003 rent roll showed a ninety-three percent occupancy rate. They also point to the documents Druce received during due diligence that showed occupancy rates in the mid-seventies, Druce's testimony that he knew the brochure would have exaggerations in it, and Druce's admission that he knew from walking the property that a ninety-three percent occupancy rate was too high. However, the jury also received evidence that the rent rolls given to Druce showed occupancy rates of ninety-three, seventy-three, eighty-six, and eighty-six percent; that the occupancy rates were intentionally inflated because tenants had not been removed from the rent roll when they had moved out; that Druce believed at the time of closing, based on the inaccurate information provided to him, that the occupancy rate was eighty-seven percent; that Druce was satisfied with an eighty-seven percent occupancy rate; but that the actual occupancy rate at closing (of which Druce was not aware) was between seventy and seventy-five percent, with almost half of the vacant units uninhabitable. The jury could have reasonably determined that Druce Properties justifiably relied on Appellants' representations concerning the occupancy rate.

Appellants also attempt to refute the representation in the marketing brochure that said, "Major Rehab Just Completed." In doing so, Appellants point to evidence that Druce was aware that the property had issues with erosion and

32

needed new paint and that there were problems with the foundation, roof, lighting, and fence. But these items relate to deferred maintenance, not a major rehabilitation. For example, Druce testified that when he inspected the property, he asked to see a representative sample of the units; that he inspected approximately ten of the ninety-nine units; that of the ten units he inspected, most were occupied, the vacant units had only minor damage, and none was uninhabitable; and that his inspection seemed consistent with the representation that major rehabilitation had just been completed. Druce also testified that no one disclosed to him that rehabilitation was not complete and that he would have asked to see more units if that had been disclosed. The jury could have reasonably determined that Druce Properties justifiably relied on Appellants' representations concerning rehabilitation of the property.

Appellants also challenge Druce Properties's reliance on any representations about crime problems at the property.[15] They first point to evidence that the due diligence documents disclosed crime issues on the property.[16] However, the due diligence documents were described at trial as being 1,500 to 2,000 pages of documents. Of those 1,500 to 2,000 pages, a

---

[15]Druce testified that no one told him about the crime problem, and Dowdle testified that Burns told Druce during the due diligence period that the crime issues were nothing more than loud noise that is typical of apartment complexes.

[16]There is some question whether the trial exhibit representing the due diligence documents accurately reflects the information provided to Druce. Druce testified that the trial exhibit contained internal Legend documents that had not been provided to him.

mere seven pages contained short descriptions of potential crime problems spread over several months and involving only four of the ninety-nine units. One weekly manager's report stated: "Resident Problems: Prostitutes"; two weekly manager's reports stated that a resident of apartment 212-06 was stealing from a nearby business and dealing drugs; two weekly manager's reports stated that too many people were hanging out at the end of building 204; and two delinquency reports stated that the resident of apartment 208-04 was "in jail should be here 12-28-[03]." In addition, Druce's knowledge of the crime problem must be viewed in context with Appellants' representations about the income stream, which led Druce to believe that the income stream would increase once the crime problem was resolved. *See generally City of Keller*, 168 S.W.3d at 811 (discussing contextual evidence). Thus, even if the trial exhibit accurately represented the documents Druce received during due diligence, the crime issues noted in the documents were not so prevalent as to negate justifiable reliance as a matter of law. *See Allen*, 2011 WL 3208234, at *17, 20 (holding lack of justifiable reliance not conclusively proved despite, among other things, plaintiff's knowledge of increased prices before closing).

Appellants also point to evidence that all Class C properties have some issues with crime, that Druce spoke with Morrison about the crime issues before closing, and that Druce discussed the crime problem with an Arlington police officer four days before closing and decided to close anyway. But there is no evidence that Druce knew crime was a potential problem with Class C properties;

34

in fact, Druce did know about the necessity of criminal background checks before he bought the property in 2004. Furthermore, Druce's conversation with Morrison occurred at the same time Druce was speaking with the police officer. Finally, the conversation with the police officer occurred four days before closing in July, a time when Druce no longer had an unconditional right to terminate the contract.[17] Thus, Druce's knowledge before closing does not conclusively negate Druce Properties's justifiable reliance. *See id.* at *17–20.

There is no question that the jury in this case heard conflicting evidence. As a reviewing court, we defer to the jury on issues concerning the credibility of witnesses, the weight to be given to witness testimony, and the resolution of conflicts in the evidence. *See City of Keller*, 168 S.W.3d at 819. Applying the appropriate standard of review, we hold that, given Druce's individual characteristics, abilities, and appreciation of the facts and circumstances at or before the time of Appellants' misrepresentations, legally sufficient evidence supports the jury's finding that Druce Properties justifiably relied on Appellants' representations. *See Grant Thornton L.L.P.,* 314 S.W.3d at 923; *Cent. Ready*

---

[17]The contract, signed in March, gave Druce the right to terminate the contract if he knew that Matlock Place had made a false representation or warranty concerning Matlock Place's "right, power and authority to sell and convey the Property"; Matlock Place's payment of "taxes, charges, debts, and other assessments" through 2004; or the existence of unrecorded liens that would not be satisfied by the sale. None of these relates to the representations at issue in this case.

*Mix Concrete Co.*, 228 S.W.3d at 651; *City of Keller*, 168 S.W.3d at 807, 827. We overrule this portion of Appellants' first issue.

## E. Scienter

Appellants also contend in their first issue that the evidence supporting Kofdarali's and Burns's individual liability is legally and factually insufficient. Specifically, Appellants argue there is "no evidence that Kofdarali or Burns communicated any false statement on which Druce Properties relied or that [Kofdarali and Burns] had any scienter making such statements." Appellants do not contest that Kofdarali and Burns would be personally liable for their own fraudulent or tortious acts. *See Miller v. Keyser*, 90 S.W.3d 712, 717 (Tex. 2002). Instead, they argue the evidence is insufficient to sustain that individual liability.

### 1. Kofdarali

The jury found that Kofdarali committed statutory fraud. The court's charge defined statutory fraud as follows:

A party commits statutory fraud if:

a. there is a false representation of a past or existing material fact,

b. the false representation is made to a person for the purpose of inducing that person to enter into a contract, and

c. the false representation is relied on by that person in entering into that contract.

Because Appellants did not object to the language of this instruction, we measure the sufficiency of the evidence based on this instruction as submitted to

36

the jury.[18]  *See Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 715 (Tex. 2001); *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 71 (Tex. 2000).

Appellants argue that Kofdarali did not correspond with Druce, personally spoke with Druce only one time concerning the roof, and did not have knowledge that any representations to Druce were false.  But Appellants ignore evidence favorable to the jury's statutory fraud finding against Kofdarali.  For example, the evidence reflects that Kofdarali decided to sell the property upon determining that the cost to rehabilitate it was too great.  Kofdarali admitted that the rehabilitation was not complete, and other evidence reflected that the property required substantial deferred maintenance after Druce purchased it.  Furthermore, Kofdarali personally approved the marketing brochure, a document that he knew buyers would believe to be accurate and that represented that the property required "very little deferred maintenance" and stated, "Major Rehab Just Completed."  Applying the appropriate standards of review, we hold that legally and factually sufficient evidence supports the jury's finding that Kofdarali committed statutory fraud, and we overrule this part of Appellant's first issue.

### 2. Burns

The jury similarly found that Burns committed statutory fraud.  Appellants argue that Burns cannot be individually liable because she did not forward any

---

[18]The statutory fraud question included a second instruction defining statutory fraud in the context of a false promise to do an act.  We do not address the sufficiency of the evidence based on that instruction in light of our conclusion as to the instruction quoted above.  *See generally* Tex. R. App. P. 47.1.

documents directly to Druce and did not perform the data entry that led to the inflated occupancy rates. Appellants also point out that Druce described Burns as being very helpful when he spoke with her and that Druce testified that he did not remember relying on anything Burns told him when purchasing the property. However, there is evidence that Burns specifically told Druce during the due diligence period that the crime was "your standard loud noise . . . which you get in almost all apartment complexes." But Burns testified at trial that crime is a problem at the property. Furthermore, although Druce testified that he did not recall anything from Burns that he relied on when purchasing the property, he also testified that no one told him about the crime problem before he spoke with the police officer four days before closing and that the crime problem was so bad that there was a murder on the property five months after he bought it. Given that Burns made the false representation concerning the crime problem during the due diligence period, it can be inferred from the circumstances that she made the representation with the intent that Druce Properties rely on it and enter into the contract. *See Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 526 (Tex. 1998) ("Proof that a defendant made a statement knowing of its falsity or without knowledge of its truth may be proved by direct or circumstantial evidence."); *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434–35 (Tex. 1986) ("Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony."); *Hannon, Inc. v. Scott*, No. 02-10-00012-

CV, 2011 WL 1833106, at *6 (Tex. App.—Fort Worth May 12, 2011, pet. denied) (mem. op.) ("Intent may be inferred from a party's actions before and after the fraudulent conduct."). Furthermore, the spoliation instruction in the jury charge permitted an inference that the destroyed data would have been unfavorable to Burns. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 306 (Tex. 2006) ("Spoliation of evidence normally supports an inference only that the evidence was unfavorable, not that it was created *ab initio* with fraudulent intent. But as the evidence here was part of the original contracting process, it provides some circumstantial evidence of fraud in that process.").

Again, the jury in this case clearly heard conflicting evidence. But we must as a reviewing court defer to the jury's determinations of credibility, weight, and conflicts in the evidence. *See City of Keller*, 168 S.W.3d at 819. Therefore, applying the appropriate standards of review, we hold that legally and factually sufficient evidence supports the jury's finding that Burns committed statutory fraud, and we overrule this part of Appellant's first issue.[19]

## F. Economic Loss Rule

Appellants also argue in their first issue that Druce Properties's only alleged damages arise from a contract and that Druce Properties therefore cannot maintain a tort cause of action for the same damages.

---

[19]Because we have affirmed the sufficiency of the evidence supporting the jury's statutory fraud findings against Kofdarali and Burns, we need not address Druce Properties's claims for fraud by nondisclosure and negligent misrepresentation. *See* Tex. R. App. P. 47.1.

As we stated in *Heil Co. v. Polar Corp.*,

> Although a party's actions may breach duties in tort, contract, or both, Texas has long recognized that "mere nonfeasance under a contract creates liability only for breach of contract." *Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 13 (Tex. 1996); *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986). "When the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone." *Reed*, 711 S.W.2d at 618. Thus, tort damages are generally not recoverable unless the plaintiff suffers an injury that is independent and separate from the economic losses recoverable under a breach of contract claim. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 45–47 (Tex. 1998); *Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991) (analyzing both the source of the duty and the nature of the remedy in determining a claim's characterization as sounding either in contract or tort); *see also Fed. Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442–43 (Tex. 1991) (adopting independent injury requirement of section 552B of the Restatement (Second) of Torts). The supreme court in *Formosa*, however, declined to apply the independent injury requirement to a fraudulent inducement claim. *Formosa*, 960 S.W.2d at 47.

191 S.W.3d 805, 815–16 (Tex. App.—Fort Worth 2006, pet. denied).

Appellants do not dispute that the economic loss rule does not apply to claims for fraudulent inducement. Instead, they mistakenly argue that Druce Properties did not assert a fraudulent inducement claim. Contrary to Appellants' contention, Druce Properties's pleading included an allegation that Appellants made "representations with the intent of inducing Druce to enter into and close the sale of" the property, and the jury found in response to the statutory fraud question that Appellants had made false representations "for the purpose of inducing [Druce Properties] to enter into a contract." Druce Properties's statutory fraud claim was therefore based on fraudulent inducement, and the economic

40

loss rule does not bar Druce Properties's statutory fraud tort damages. *See id.*;

*see also Formosa*, 960 S.W.2d at 47; *Reservoir Sys., Inc. v. TGS-NOPEC Geophysical Co., L.P.*, 335 S.W.3d 297, 308 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) ("Tort damages are recoverable for a fraudulent-inducement claim irrespective of whether the fraudulent representations are later subsumed in a contract or whether the plaintiff only suffers an economic loss related to the subject matter of the contract."). We overrule this part of Appellant's first issue.

## G. Breach of Contract

In the final part of their first issue, Appellants argue that the evidence is legally and factually insufficient to support Druce Properties's claim for breach of contract against Matlock Place.

Druce Properties contended at trial and argues on appeal that Matlock Place breached the contract by providing falsified rent rolls. The contractual provision at issue provided as follows:

> 7.  SUBMISSION MATTERS:  Buyer acknowledges receipt of the following materials and waives any contingency attached to these documents.
>
> . . .
>
> (f)  a rent roll of a recent date;
>
> . . .
>
> Seller makes no representation or warranty, expressed or implied, as to the accuracy or completeness of the information contained in the Submission Matters except that Seller has delivered all such items in Seller's actual possession.

41

Appellants interpret this provision as a mere acknowledgement of a past act that could not be breached. Druce Properties responds that the letter of intent allowed Druce twenty-one days "to inspect the subject property and perform due diligence on all records" and that Appellants continued providing Druce with documents after the contract was signed. Thus, Druce Properties argues that this triggered an implied contractual obligation of cooperation. But the contract contained a merger clause providing that it superseded all "prior understandings or written or oral agreements between the parties." *See, e.g.*, *Springs Window Fashions Div., Inc. v. Blind Maker, Inc.*, 184 S.W.3d 840, 870 (Tex. App.—Austin 2006, pet. granted, judgm't vacated w.r.m.) ("A merger clause . . . memorializes the parties' intent to integrate or absorb their prior negotiations, agreements, or understandings concerning the same subject matter into a subsequent written contract."). Thus, Druce Properties cannot rely on the letter of intent to support an obligation by Matlock Place to provide an accurate rent roll.

Druce Properties also argues that the contract included an implied duty to perform the contract with care, skill, reasonable expedience, and faithfulness. But the cases upon which Druce Properties relies do not support its contention. *See Bank One, Tex. N.A. v. Stewart*, 967 S.W.2d 419, 434 (Tex. App.—Houston [14th Dist.] 1998, pet. denied) (declining to interpret implied covenant to cooperate into bailment agreement); *see also Montgomery Ward & Co. v. Scharrenbeck*, 146 Tex. 153, 157, 204 S.W.2d 508, 510 (1947) (recognizing

implied contractual duty to perform *services contract* without negligence); *Jones v. Star Houston, Inc.*, 45 S.W.3d 350, 355 (Tex. App.—Houston [1st Dist.] 2001, no pet.) (acknowledging implied duty to perform *services contract* with ordinary care).

Moreover, Texas courts look "beyond the written agreement to imply a covenant only if necessary to effectuate the intention of the parties as disclosed by the contract as a whole, but not to make the contract fair, wise, or just." *Stewart*, 967 S.W.2d at 434 (citing *Nalle v. Taco Bell Corp.*, 914 S.W.2d 685, 687 (Tex. App.—Austin 1996, writ denied)). "An implied covenant is necessary to effectuate the parties' intentions only if the obligation is 'so clearly within the contemplation of the parties that they deemed it unnecessary to express it.'" *Id.* (quoting *Nalle*, 914 S.W.2d at 687). Furthermore, "'[t]here can be no implied covenant as to a matter specifically covered by the written terms of the contract.'" *Id.* at 434–35 (quoting *Texstar N.A., Inc. v. Ladd Petroleum Corp.*, 809 S.W.2d 672, 678 (Tex. App.—Corpus Christi 1991, writ denied)). Here, the contract provision upon which Druce Properties relies merely acknowledges that Druce received the documentation, and the provision expressly disclaimed any representation or warranty concerning the accuracy or completeness of the information. Druce Properties does not dispute that Druce received a rent roll and contends only that the rent roll was not accurate. In this scenario, we are not free to imply a covenant into the contract to make it fair or just. *See id.* We hold

that there is legally insufficient evidence to support the jury's finding that Matlock Place breached the contract, and we sustain this portion of Appellant's first issue.

## IV. Jury Charge Instructions

Appellants contend in their second issue that the trial court erred by submitting two jury instructions. The first instruction concerned spoliation of evidence, and the second concerned the "as is" clause in the contract.

## A. Spoliation Instruction

Appellants argue that the trial court erred by submitting a spoliation instruction because there was no evidence to support it.[20]

### 1. Applicable Law

"A spoliation instruction is an instruction given to the jury outlining permissible inferences they may make against a party who has lost, altered, or destroyed evidence." *Tex. Elec. Coop. v. Dillard*, 171 S.W.3d 201, 208 (Tex. App.—Tyler 2005, no pet.); *Brewer v. Dowling*, 862 S.W.2d 156, 159 (Tex. App.—Fort Worth 1993, writ denied). The use of a spoliation instruction is generally limited to two circumstances: (1) the deliberate destruction of relevant evidence; and (2) the failure of a party to produce relevant evidence or to explain its non-production. *Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 721 (Tex.

---

[20]To the extent Appellants argue that the spoliation instruction was an incorrect statement of law, they did not present that contention to the trial court by objecting to the jury charge. Appellants therefore failed to preserve that argument for appellate review. *See* Tex. R. App. P. 33.1(a); Tex. R. Civ. P. 272; *see also Wackenhut Corp. v. Gutierrez*, No. 04-10-00661-CV, 2011 WL 3915630, at *2 (Tex. App.—San Antonio Sept. 7, 2011, no pet. h.) (mem. op.) (holding spoliation complaint not preserved due to failure to object to charge instruction).

2003) (citing *Anderson v. Taylor Publ'g Co.*, 13 S.W.3d 56, 61 (Tex. App.—Dallas 2000, pet. denied)). Under the first circumstance, a party who has deliberately destroyed evidence is presumed to have done so because the evidence was unfavorable to its case. *Id.* at 721–22 (citing *Williford Energy Co. v. Submergible Cable Servs., Inc.*, 895 S.W.2d 379, 389–90 (Tex. App.—Amarillo 1994, no writ), and *Brewer*, 862 S.W.2d at 159). Under the second circumstance, the presumption arises because the party controlling the missing evidence cannot explain its failure to produce it. *Id.* at 722 (citing *Watson v. Brazos Elec. Power Coop., Inc.*, 918 S.W.2d 639, 643 (Tex. App.—Waco 1996, writ denied)).

A trial court may be guided by the following three factors in determining whether a spoliation presumption is justified: (1) whether there was a duty to preserve evidence; (2) whether the alleged spoliator either negligently or intentionally spoliated evidence; and (3) whether the spoliation prejudiced the nonspoliator's ability to present its case or defense. *Trevino v. Ortega*, 969 S.W.2d 950, 954–55 (Tex. 1998) (Baker, J., concurring).

We review the submission of a spoliation instruction under an abuse of discretion standard. *Crescendo Invs., Inc. v. Brice*, 61 S.W.3d 465, 479 (Tex. App.—San Antonio 2001, pet. denied); *see Johnson*, 106 S.W.3d at 722–23; *Conditt v. Morato*, No. 02-06-00214-CV, 2007 WL 2693968, at *3 (Tex. App.—Fort Worth Sept. 13, 2007, pet. denied) (mem. op.).

## 2. Discussion

The instruction at issue stated:

Spoliation of evidence occurs in two circumstances when a party knew or should have known that certain evidence is relevant: (1) the deliberate destruction of the relevant evidence or (2) the failure of a party to produce the relevant evidence or to explain its non-production. In either situation, a presumption arises that the evidence was unfavorable to the party who committed spoliation.

Appellants first argue that they did not have a duty to preserve evidence because they were not on notice of Druce Properties's claim when the documents were destroyed. Before any failure to produce material evidence may be viewed as discovery abuse, the opposing party must establish that the nonproducing party had a duty to preserve the evidence in question. *Dillard*, 171 S.W.3d at 209 (citing *Johnson*, 106 S.W.3d at 722). There must be a sufficient foundational showing that the party who destroyed the evidence had notice both of the potential claim and of the evidence's potential relevance thereto. *Dillard*, 171 S.W.3d at 209 (citing *Johnson*, 106 S.W.3d at 722).

Druce Properties filed this lawsuit in March 2006, and Appellants filed their answer in April 2006. Druce Properties, in September 2006, requested that Appellants produce documents and data, including that in electronic form, relating to the occupancy, management, and improvement of the property. In November and December 2006, Druce Properties sent notices for the depositions of Kofdarali and Burns, both of which included requests for production of the same type of documents and data. Despite these document

46

requests, Appellants did not respond to the requests for production until late-December 2007. In their December 28, 2007 request for production response, Burns and Legend responded as follows:

> My records for this time period are no longer in existence. These records would have been kept on computers and were stored at my offices in Arlington. Those offices burned in June 2007, causing a loss of all data. However, the records were provided previously to Marcus & Millichap and have been produced to Plaintiffs in that litigation. I would refer Plaintiffs to the documents, which reflect these numbers.

Kofdarali and Matlock Place's response was virtually identical but also stated: "To the extent the documents were previously provided to me, those records were not maintained after the sale of the property, as is our standard."

At trial, Kofdarali testified that it is his standard practice to destroy all paper copies relating to a property once the tax return has been completed. Thus, because the property sold in 2004, he destroyed any remaining paper copies after completing the 2004 taxes during the year 2005. But Kofdarali also testified that he was aware in 2006 of Druce Properties's document request and that he knew the document request sought both paper and electronic copies. And Kofdarali confirmed that he and the other appellants did not respond to the pre-fire discovery requests for more than a year and until well after the June 2007 fire. However, Kofdarali also testified that he and Burns discussed the spoliation issue the night before he testified and discovered that there would not have been any data about the property on Legend's computers at the time of the fire because Legend stopped paying the software company for access to the

47

electronic data relating to the property shortly after Druce Properties purchased the property. Burns testified similarly and added that Legend would have "boxed up" any paper documents in its possession after the sale and sent them to Kofdarali within ninety days of the sale. However, Burns testified both that after a sale, Legend "delete[s] a lot of stuff off of our system simply to free up space" and that the data "stays on that computer" but is inaccessible once the software license is not renewed.

On appeal, Appellants maintain they had no duty to preserve evidence because the paper copies were destroyed in 2005 before they had notice of a claim and that the electronic copies were inaccessible in 2004 once Legend stopped paying the software licensing fee. But Appellants ignore the inconsistencies in their pretrial and trial positions. Druce Properties requested documents, paper or electronic, from Appellants in September 2006, and Appellants did not respond to Druce Properties's document request until December 28, 2007. In the meantime, according to Kofdarali and Burns, a fire destroyed the computers stored at Legend's corporate office. However, Druce Properties could have inspected the actual computers had Appellants not delayed in responding to the document requests, and the June 2007 fire would not have been an issue. Further, if Legend in fact deleted electronic files shortly after the sale, Appellants could have said as much in their initial discovery response, and neither the fire nor the decision not to maintain the software license would have been an issue. Appellants instead chose to initially rely on

48

the fire without mentioning the inconsistent explanations of deleting electronic files and not maintaining the software license. Because of Appellant's inconsistent and changing explanations, we cannot say the trial court abused its discretion by determining that Appellants had a duty to preserve relevant evidence. *See generally Cresthaven Nursing Residence v. Freeman*, 134 S.W.3d 214, 228 (Tex. App.—Amarillo 2003, no pet.) (holding that inconsistencies in testimony and paper records, among other things, provided more than a scintilla of evidence to support submission of spoliation instruction).

Appellants also argue that there is no evidence that the destroyed documents would have helped Druce Properties's case. To determine whether the spoliation hindered Druce Properties's ability to present its case, we look to a variety of circumstances such as the relevancy of the missing evidence and the availability of other evidence to take the place of the missing information. *See Trevino*, 969 S.W.2d at 958 (Baker, J., concurring). Ocampo testified that Morrison told her not to remove tenants from the rent roll when they moved out, and the rent rolls and internal reports, which showed significantly different occupancy rates only days apart, arguably supported Ocampo's testimony. Had the data at issue not been destroyed, it could have further confirmed Ocampo's testimony. Although this on first blush suggests that any destroyed data would have merely been cumulative of other evidence in the record, we note that the case was hotly contested on all liability issues. The existence of additional evidence showing that income and occupancy rates had been intentionally

49

altered could have significantly aided the presentation of Druce Properties's case. And to the extent that we cannot determine with certainty what else the data might have shown, we are unable to do so because Appellants destroyed it. *See Brookshire Bros., Ltd. v. Aldridge*, No. 12-08-00368-CV, 2010 WL 2982902, at *7–8 (Tex. App.—Tyler July 30, 2010, pet. filed) (mem. op.) (holding spoliation prejudiced plaintiff because remaining portion of video showed only part of events relevant to plaintiff's accident). We therefore hold the trial court did not abuse its discretion by determining that the missing evidence prejudiced Druce Properties's ability to present its case. We overrule this part of Appellants' second issue.

## B. "As Is" Instruction

Appellants argue in the remainder of their second issue that the trial court erred by submitting a jury instruction concerning the "as is" clause in the contract.

### 1. Applicable Law

The trial court "shall submit such instructions and definitions as shall be proper to enable the jury to render a verdict." Tex. R. Civ. P. 277. An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence. *Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 221 (Tex. 2010) (quoting *Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002)). Generally, we review the trial court's decisions on how to charge the jury for an abuse of discretion; however, when the appellant challenges an instruction or definition as legally incorrect, we review the

instruction or definition de novo. *Id.*; *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 525 (Tex. 2002). If the charge is legally correct, the trial court has broad discretion regarding the submission of questions, definitions, and instructions. *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 664 (Tex. 1999).

## 2. Discussion

The trial court submitted the following instruction to the jury:

A buyer is not bound by an agreement to purchase something "as is" if he has been induced to enter into an agreement because of a fraudulent representation or concealment of information by the seller.

Appellants first argue that this instruction is legally incorrect.[21] Appellants do not dispute that the instruction as given correctly states the rule as set forth in *Prudential Insurance Co. of America v. Jefferson Associates., Ltd.*, 896 S.W.2d 156, 162 (Tex. 1995) ("A buyer is not bound by an agreement to purchase something 'as is' that he is induced to make because of a fraudulent representation or concealment of information by the seller."). Instead, Appellants cite *Forest Oil* and contend that the instruction was legally incorrect because it "completely leaves out necessary and corresponding language from the Texas Supreme Court that the waiver language in the 'as is' clause can be enforceable and can negate reliance."

_____

[21]Appellants preserved this complaint for appellate review by objecting to the submission of the instruction before it was submitted to the jury. *See Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 43–44 (Tex. 2007); *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992) (op. on reh'g); *see also* Tex. R. Civ. P. 274.

We held above that the disclaimer of reliance clause in the contract is enforceable. In light of that holding, we agree with Appellants that the "as is" instruction is an incorrect statement of the law. In *Forest Oil* and *Schlumberger*, the supreme court held that a disclaimer of reliance clause is enforceable if the disclaimer clause's language clearly and unequivocally disclaims reliance on the other party's representations and if other circumstances are present. *Forest Oil*, 268 S.W.3d at 60–61; *Schlumberger*, 959 S.W.2d at 179–81. If the clear and unequivocal language appears in the parties' agreement, as it does in this case, and the other circumstances are present, as they are in this case, it is not legally correct to instruct the jury that a "buyer is not bound by an agreement to purchase something 'as is' if he has been induced to enter into an agreement because of a fraudulent representation or concealment of information by the seller." *See Forest Oil*, 268 S.W.3d at 60–61; *Schlumberger*, 959 S.W.2d at 179–81; *see also Halmos v. Bombardier Aerospace Corp.*, 314 S.W.3d 606, 617 (Tex. App.—Dallas 2010, no pet.) ("An instruction that misstates the law as applicable to the facts or misleads the jury is improper."). The trial court therefore erred by submitting a legally incorrect instruction to the jury.

### 3. Harmful Error

To obtain reversal of a judgment based upon an error in the trial court, the appellant must show that the error occurred and that it probably caused rendition of an improper judgment or probably prevented the appellant from properly presenting the case to this court. Tex. R. App. P. 44.1(a); *Romero v. KPH*

52

*Consolidation, Inc.*, 166 S.W.3d 212, 225 (Tex. 2005). "'Charge error is generally considered harmful if it relates to a contested, critical issue.'" *Crump*, 330 S.W.3d at 225 (quoting *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex. 2009)). Unless the appellate court is reasonably certain that the jury was not significantly influenced by issues erroneously submitted to it, the error is reversible. *Romero*, 166 S.W.3d at 227–28.

Here, all issues in the case were hotly contested, especially liability for fraud, and the evidence presented a close case that the jury could have legitimately decided in favor of either Druce Properties or Appellants. Furthermore, we have held that Druce Properties's claims against Matlock Place are either barred by the disclaimer of reliance clause or not supported by legally sufficient evidence. Therefore, we cannot be reasonably certain that the jury was not significantly influenced by the trial court's submission of this legally incorrect instruction. Thus, the trial court's error was harmful, and we sustain this portion of Appellants' second issue.[22]

## V. Conclusion

Having sustained in part and overruled in part Appellants' first issue, having sustained in part and overruled in part Appellants' second issue, and

---

[22]Because we sustain this portion of Appellants' second issue and must therefore remand for a new trial, we do not address Appellants' third issue (in which they contend that the trial court erred by excluding evidence of Druce Properties's damages) or Appellants' fourth issue concerning attorney's fees. *See* Tex. R. App. P. 47.1.

having not reached the remainder of Appellants' issues, we reverse the portion of the trial court's judgment relating to Druce Properties's claims against Matlock Place and render judgment that Druce Properties take nothing against Matlock Place. We also reverse the remainder of the trial court's judgment and remand this case for a new trial consistent with this opinion.

ANNE GARDNER
JUSTICE

PANEL: DAUPHINOT, GARDNER, and WALKER, JJ.

DAUPHINOT, J. dissents without opinion.

DELIVERED: January 12, 2012