

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-12-00206-CV

KELLY L. KILPATRICK                                                    APPELLANT

V.

TIMOTHY S. KILPATRICK AND                                             APPELLEES
KEVIN K. KILPATRICK

----------

## FROM THE 17TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

In one issue, Appellant Kelly L. Kilpatrick appeals the trial court's summary judgment for Appellees Timothy (Tim) S. Kilpatrick and Kevin K. Kilpatrick. We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. Background

In 1997, Kelly sold his shares in Pescor, a closely held, family-run business, to his brothers, Tim and Kevin (the 1997 Sale). As part of the sale, Kelly signed a purchase agreement and a severance and release agreement; both agreements contained language releasing Tim and Kevin from future claims. The purchase agreement also contained a provision granting Kelly a proportionate share of the sale proceeds if Tim and Kevin sold Pescor within twelve months of the agreement.

Four years later, Tim and Kevin sold Pescor to Berry Plastics Corporation (the Berry Sale); Kelly received none of the proceeds. Around four months after the sale, Kelly sued Tim and Kevin for breach of fiduciary duty, common-law fraud, securities fraud, fraudulent inducement, minority shareholder oppression, breach of contract, fraudulent transfers, and duress with regard to both the 1997 Sale and the Berry Sale.

Kelly alleged in his petition that before the 1997 Sale, his brothers harassed, verbally threatened, and physically assaulted him to induce him to sell. Kelly also alleged that he believed that the proportionate share provision originally contained no time limit and that the limit was added after he signed it when the contract was taken to be notarized.

At his mother's request, Kelly agreed to meet with Tim and Kevin to discuss settling the lawsuit. Kelly alleged that Tim and Kevin told him during the meeting that they had each received $1,000,000 in the Berry Sale. Kelly had

reviewed Berry's 10-Q[2] and discovered that Berry had paid $25,000,000 for Pescor. When he asked his brothers about the $25,000,000 purchase price, they told him that most of the proceeds had been used to pay Pescor's debt. Tim wrote out how the money had been distributed. Kelly alleged that his mother and brothers then appealed to his sense of family loyalty to encourage him to sign the settlement agreement by stating that the upcoming Christmas could be his father's last, that Tim and Kevin could go to jail as a result of the lawsuit, and that they would be a "family" again if he signed.

Kelly, Tim, and Kevin entered into a settlement agreement in December 2001, and the trial court granted Kelly's motion to dismiss his claims with prejudice. The settlement agreement released Tim and Kevin from all present and future claims and disclaimed any reliance by Kelly on Tim and Kevin's prior representations.

In 2010, Kelly learned through conversations with his mother, a cousin, and two of Kevin's acquaintances that Kevin owned a house in Colorado worth $3,500,000 and had flown guests in for a party, had not been employed for ten years but had recently purchased a business, owned a private jet, and was spending a "large amount of money" remodeling a home; that Kevin and Tim co-owned a 2,800 acre ranch in Texas; and that both Kevin and Tim had purchased

_____

[2]A 10-Q is a quarterly disclosure statement required by the Securities Exchange Commission. *See* 17 C.F.R. § 240.13a–13 (2013).

real estate in Fort Worth. Kelly concluded from this information that Tim and Kevin had made false representations about how much money they had received in the Berry Sale to convince him to sign the settlement agreement.

Kelly sued Tim and Kevin in 2011, alleging statutory fraud in a stock transaction, the sale of a security by untruth or omission in violation of the Texas Securities Act, and minority shareholder oppression as to the 1997 Sale; negligent misrepresentation, negligence and gross negligence, and fraudulent concealment as to the 2001 settlement agreement; and common-law fraud, breach of fiduciary duty, fraudulent inducement, and duress as to both the 1997 Sale and the 2001 settlement agreement. Kelly alleged that he was not aware of the disclaimer in the settlement agreement when he signed it and that he signed the settlement agreement outside the presence of counsel.

Tim and Kevin counterclaimed for breach of contract and fraud and moved for summary judgment on their affirmative defenses of limitations, the releases contained in the 1997 Sale and 2001 settlement agreements, res judicata on the 1997 Sale claims, disclaimed reliance on the fraud claims, and quasi-estoppel. Tim and Kevin also moved for traditional summary judgment on Kelly's negligence claim and for both traditional and no-evidence summary judgment on Kelly's duress and fiduciary duty claims.

The trial court granted Tim and Kevin's motion for summary judgment without stating upon which ground or grounds, and Tim and Kevin nonsuited their counterclaims. This appeal followed.

4

## III. Summary Judgment

In one issue with multiple sub-issues, Kelly argues that the trial court erred by granting summary judgment for Tim and Kevin because fact issues remain as to his claims for fraud, statutory fraud, fraudulent inducement, minority shareholder oppression, breach of fiduciary duty, negligent misrepresentation, negligence, gross negligence, and violations of the Texas Securities Act.

Specifically, Kelly contends:  (1) there was a genuine issue of material fact regarding the existence of a fiduciary relationship between the parties when they entered into the settlement agreement; (2) the disclaimer of reliance in the settlement agreement was unenforceable as a matter of law and the parties' fiduciary relationship prevents the disclaimer of reliance from barring Kelly's fraudulent inducement claim; (3) Tim and Kevin presented insufficient evidence to prevent tolling the limitations periods on each of Kelly's claims under the discovery rule and the doctrine of fraudulent concealment; (4) Tim and Kevin failed to show that Kelly knew of all material facts, eliminating their quasi-estoppel and res judicata defenses; and (5) release was not an appropriate ground for summary judgment because a genuine issue of material fact existed regarding his fraudulent inducement claim.

The crux of Kelly's 2011 lawsuit was that Tim and Kevin fraudulently induced him into signing the 2001 settlement agreement by misrepresenting the amount they personally received from the Berry Sale.

5

## A. Preservation of Error

When the trial court's judgment rests upon more than one independent ground or defense, the aggrieved party must assign error to each ground, or the judgment will be affirmed on the ground to which no complaint is made. *Scott v. Galusha*, 890 S.W.2d 945, 948 (Tex. App.—Fort Worth 1994, writ denied).

Kelly pleaded causes of action from both the 1997 Sale and the 2001 settlement agreement, and Tim and Kevin raised the defense of release pursuant to the releases in both documents. However, Kelly addresses on appeal only the release he signed in the 2001 settlement agreement.[3] Because the trial court could have granted Tim and Kevin's motion for summary judgment on the 1997 Sale-related claims based on the release in the sale documents, Kelly has waived any error on his claims of statutory fraud in a stock transaction, the sale of a security by untruth or omission in violation of the Texas Securities Act, and minority shareholder oppression and his claims of common-law fraud, breach of

---

[3]In response to Tim and Kevin's claim that he failed to address on appeal the release contained in the 1997 Sale documents, Kelly argues in his reply brief that the release contained in the 1997 Sale documents does not bar his sale-related claims. Because this issue was not raised in Kelly's original brief, we cannot address it. *Dallas Cnty. v. Gonzales*, 183 S.W.3d 94, 104 (Tex. App.—Dallas 2006, pet. denied) (op. on reh'g) ("The Texas Rules of Appellate Procedure do not allow an appellant to include in a reply brief a new issue in response to some matter pointed out in the appellee's briefs but not raised by the appellant's original brief."); *see also* Tex. R. App. P. 38.3.

6

fiduciary duty, and fraudulent inducement as they relate to the 1997 Sale. *See id.* We overrule Kelly's first issue as it pertains to these claims.[4]

## B. Fiduciary Duty

Tim and Kevin moved for a traditional and no-evidence summary judgment on Kelly's breach of fiduciary duty claim as it related to the 2001 settlement agreement.[5] In his first sub-issue, Kelly contends that the trial court erred by granting Tim and Kevin's motion for summary judgment on his breach of fiduciary duty claim and cites his prior business relationship with his brothers as evidence that a fiduciary relationship existed between the parties during the 2001 settlement negotiations.

After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant's claim or defense. Tex. R. Civ. P. 166a(i). The motion must specifically state the elements for which there is no evidence. *Id.*; *Timpte Indus., Inc. v. Gish*, 286

---

[4]Likewise, as Kelly does not appeal the trial court's summary judgment on his duress allegations as to either the 1997 Sale or the 2001 settlement agreement, he has also waived these claims on appeal.

[5]When a party moves for summary judgment under both rules 166a(c) and 166a(i), we will first review the trial court's judgment under the standards of rule 166a(i). *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). If the appellant failed to produce more than a scintilla of evidence under that burden, then there is no need to analyze whether the appellee's summary judgment proof satisfied the less stringent rule 166a(c) burden. *Id.*

S.W.3d 306, 310 (Tex. 2009). The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact. *See* Tex. R. Civ. P. 166a(i) & cmt.; *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008).

When reviewing a no-evidence summary judgment, we examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006). We review a no-evidence summary judgment for evidence that would enable reasonable and fair-minded jurors to differ in their conclusions. *Hamilton*, 249 S.W.3d at 426 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005)). We credit evidence favorable to the nonmovant if reasonable jurors could, and we disregard evidence contrary to the nonmovant unless reasonable jurors could not. *Timpte Indus.*, 286 S.W.3d at 310 (quoting *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006)). If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper. *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003), *cert. denied*, 541 U.S. 1030 (2004).

Certain formal and informal relationships may give rise to fiduciary duties as a matter of law. *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 593–94 (Tex. 1992) (op. on reh'g), *superseded by statute on other*

8

*grounds as stated in Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 225–26 (Tex. 2002) (op. on reh'g). Due to their extraordinary nature, however, the law does not recognize fiduciary relationships lightly. *See Lindley v. McKnight*, 349 S.W.3d 113, 124 (Tex. App.—Fort Worth 2011, no pet.) (noting that Texas courts are reluctant to recognize fiduciary relationships); *Cotten v. Weatherford Bancshares, Inc.*, 187 S.W.3d 687, 698 (Tex. App.—Fort Worth 2006, pet. denied). Therefore, whether a fiduciary relationship exists depends on the circumstances and is "determined from the actualities of the relationship between the persons involved." *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962); *see Crim Truck*, 823 S.W.2d at 594; *Cotten*, 187 S.W.3d at 698.

Corporate officers generally owe a fiduciary duty only to the corporation. *See Cotten*, 187 S.W.3d at 698; *see also Meyer v. Cathey*, 167 S.W.3d 327, 330 (Tex. 2005) (noting that fiduciary duties arise as a matter of law in other formal relationships, such as attorney-client and trustee relationships). However, shareholders do not owe each other fiduciary duties as a matter of law, *see Pabich v. Kellar*, 71 S.W.3d 500, 504 (Tex. App.—Fort Worth 2002, pet. denied), and partners owe no fiduciary duties to one another after their relationship ends, aside from duties related to winding up the partnership, *see M.R. Champion, Inc. v. Mizell*, 904 S.W.2d 617, 618 (Tex. 1995).

An informal relationship may give rise to an informal fiduciary duty when there is "a moral, social, domestic or purely personal relationship of trust and confidence." *Chambers v. First United Bank & Trust Co.*, No. 02-11-00047-CV,

9

2012 WL 1556091, at *3 (Tex. App.—Fort Worth May 3, 2012, no pet.) (mem. op.). A person is justified in placing confidence in the belief that another party will act in his best interest only when he is accustomed to being guided by the other party's judgment or advice and the parties have a long association in a business relationship and a personal friendship. *Id.* "Thus, the relationship must exist prior to and apart from the agreement that is the basis of the suit." *Cotten*, 187 S.W.3d at 698; *see Crim Truck*, 823 S.W.2d at 594 ("The fact that one businessman trusts another, and relies upon his promise to perform a contract, does not rise to a confidential relationship.").

Similarly, family relationships, although a factor in determining whether a fiduciary duty exists, are not enough alone to establish a fiduciary relationship. *See Tex. Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 508 (Tex. 1980) (stating that the mere fact of aunt/nephew relationship combined with nephew's assistance did not create fiduciary relationship). *But see S.V. v. R.V.*, 933 S.W.2d 1, 8 (Tex. 1996) ("[P]arents generally stand in the role of fiduciaries toward their minor children . . . ."); *Young v. Fawcett*, 376 S.W.3d 209, 214 (Tex. App.—Beaumont 2012, no pet.) ("[F]amily relationships—where a person trusts in and relies upon a close member of her core family unit—may give rise to a fiduciary duty when equity requires.").

"Where the underlying facts are undisputed, determination of the existence and breach of a fiduciary duty is a question of law that is exclusively within the

10

province of the court." *Rice v. Metro. Life Ins. Co.*, 324 S.W.3d 660, 678 (Tex. App.—Fort Worth 2010, no pet.) (quoting *Meyer*, 167 S.W.3d at 330).

Kelly argues that a fiduciary relationship existed between him and his brothers because they had worked together for twelve years and had been co-directors and shareholders four years before the settlement agreement. However, Kelly points to no law that suggests that co-workers owe each other a fiduciary duty. *See M.R. Champion*, 904 S.W.2d at 618; *Cotten*, 187 S.W.3d at 698; *Pabich*, 71 S.W.3d at 504.

Further, Kelly terminated his business relationship with Tim and Kevin in 1997. Thus, because Kelly had no business relationship with his brothers when the settlement agreement was negotiated in 2001, any previously existing business relationships could no longer impose fiduciary duties on Tim and Kevin. *See M.R. Champion*, 904 S.W.2d at 618; *Cotten*, 187 S.W.3d at 698.

As further evidence of a fiduciary relationship between him and his brothers, Kelly points to evidence that his mother asked him to meet with his brothers to settle their dispute, that he trusted his brothers during the settlement agreement negotiations, and that his family appealed to his sense of family loyalty to convince him to sign the settlement agreement.

However, the fact that Kelly, Tim, and Kevin are brothers does not, by itself, establish that a fiduciary relationship existed between them. *See Moore*, 595 S.W.2d at 508.

11

Further, the record reflects that the brothers' relationship was not the kind that would have induced Kelly to trust or rely on Tim and Kevin. Kelly stated that he, Tim, and Kevin had contact only at holiday gatherings. He also alleged that Tim and Kevin had made "verbal and physical threats" to him and that he had "endured humiliating, embarrassing and openly-hostile situations at [their] hands." Indeed, he detailed several incidents that occurred before the 1997 Sale in which his brothers piled his office furniture in the middle of a company warehouse, changed the locks on his office door, and physically assaulted him. Kelly also stated in his affidavit in response to Tim and Kevin's motion for summary judgment that his brothers did not want to continue working with him. *See Muske v. Menke*, No. 01-10-00479-CV, 2011 WL 3612293, at *4 (Tex. App.—Houston [1st Dist.] Aug. 18, 2011, no pet.) (mem. op.) (holding that no fiduciary relationship existed between cousins when strained relations showed there was no "close family relationship"). *But see Morehead v. Gilmore*, No. 01-02-00685-CV, 2003 WL 1848724, at *3 (Tex. App.—Houston [1st Dist.] Apr. 10, 2003, no pet.) (mem. op.) (holding that a fiduciary relationship existed when appellant encouraged her siblings to rely on her to manage their parents' assets and the siblings so relied).

Furthermore, Kelly produced less than a scintilla of evidence that he was "accustomed to being guided by the judgment or advice" of either Tim or Kevin or that they had his confidence. *See Cotten*, 187 S.W.3d at 698. Kelly stated that he trusted and relied on Tim and Kevin although he alleged in the 2001 lawsuit

12

that he had been estranged from them for at least four years before he filed suit. As discussed above, Kelly also alleged that Tim and Kevin had verbally and physically threatened, embarrassed, and humiliated him. Additionally, the 2001 lawsuit itself, which included claims of duress, breach of fiduciary duty, fraud, fraudulent inducement, negligent misrepresentation, and fraudulent transfers, demonstrated Kelly's lack of trust in Tim and Kevin. But even if Kelly's assertion that he trusted and relied on Tim and Kevin was not undermined by their contentious relationship and the 2001 lawsuit, mere subjective trust alone does not establish a fiduciary relationship. *See Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997) (holding that mere subjective trust alone is not enough to transform an arm's length deal into a fiduciary relationship). And Kelly's assertion that his mother asked him to meet with his brothers to settle their dispute does not establish a fiduciary relationship between him and his brothers because his acquiescence to her request speaks only to the relationship between Kelly and his mother, which is not at issue in this case.

Based on the foregoing, we hold that Kelly produced less than a scintilla of evidence that a fiduciary relationship existed between him and his brothers when the parties negotiated and signed the settlement agreement in 2001. *See Hamilton*, 249 S.W.3d at 426. The trial court therefore properly granted summary judgment against Kelly on his breach of fiduciary duty claim related to the 2001 settlement agreement, and we overrule this portion of Kelly's sole issue.

13

## C. Disclaimer of Reliance

In his second sub-issue, Kelly contends the trial court erred by granting summary judgment on his claims based on his disclaimer of reliance because the 2001 settlement agreement's disclaimer does not satisfy the *Forest Oil* factors. *See Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 60 (Tex. 2008).

Although a settlement agreement may be avoided on the grounds of fraudulent inducement, a binding disclaimer provision negates the element of reliance in both fraudulent inducement and negligent misrepresentation claims. *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 331–32 (Tex. 2011); *see also Matlock Place Apartments, L.P. v. Druce*, 369 S.W.3d 355, 372–73 (Tex. App.—Fort Worth 2012, pet. denied) (holding that a disclaimer of reliance barred negligent misrepresentation claim). When knowledgeable parties discuss material issues during contract negotiations and elect to include waiver-of-reliance and release-of-claims provisions, we will generally uphold the contract, but we must examine the contract and the totality of the surrounding circumstances to determine whether a waiver-of-reliance provision is binding. *See Forest Oil*, 268 S.W.3d at 58, 60.

As a threshold matter, we determine whether the contract shows "clear and unequivocal" intent to disclaim reliance on representations. *Italian Cowboy*, 341 S.W.3d at 337 n.8; *see Schlumberger*, 959 S.W.2d at 179. If it does, then we review the following five factors to determine whether a contract's disclaimer provision is enforceable:

14

> (1) [T]he terms of the contract were negotiated, rather than boilerplate, and during negotiations, the parties specifically discussed the issue which has become the topic of the subsequent dispute; (2) the complaining party was represented by counsel; (3) the parties dealt with each other in an arm's length transaction; (4) the parties were knowledgeable in business matters; and (5) the release language was clear.

*Forest Oil,* 268 S.W.3d at 60*; see Druce*, 369 S.W.3d at 369.  The fact that the disclaimer is in a "'once and for all' settlement may constitute an *additional* factor urging rejection of fraud-based claims . . . ." *Forest Oil*, 268 S.W.3d at 58.

The 2001 settlement agreement's disclaimer of reliance clause states:

> 23.  *No representations.* **THE PARTIES WARRANT AND ACKNOWLEDGE THAT EACH OF THEM HAS BEEN GIVEN A REASONABLE PERIOD OF TIME TO CONSIDER THIS AGREEMENT AND HAS THOROUGHLY REVIEWED IT AND AGREED TO ITS TERMS WITH THE ADVICE AND COUNSEL OF THEIR RESPECTIVE ATTORNEYS.  THE PARTIES ALSO ACKNOWLEDGE THE CONTESTED AND ADVERSARIAL NATURE OF THE UNDERLYING DISPUTES AND LAWSUIT. KELLY KILPATRICK WARRANTS THAT IN EXECUTING THIS AGREEMENT HE DID NOT RELY AND HAS NOT RELIED UPON ANY REPRESENTATION OR STATEMENT MADE BY DEFENDANTS OR THEIR AGENTS, REPRESENTATIVES OR ATTORNEYS, WITH REGARD TO (1) FACTS UNDERLYING THE LAWSUIT, (2) THE SUBJECT MATTER OR EFFECT OF THIS AGREEMENT, AND (3) ANY OTHER FACTS OR ISSUES WHICH MIGHT BE DEEMED MATERIAL TO ITS DECISION TO ENTER INTO THIS AGREEMENT, OTHER THAN AS SPECIFICALLY STATED IN THIS AGREEMENT.**

The next section states:

> 24. *No duty.* **NONE OF THE PARTIES ARE RELYING UPON A LEGAL DUTY, IF ONE EXISTS, ON THE PART OF ANY OTHER PARTY (OR SUCH OTHER PARTY'S EMPLOYEES, AGENTS, REPRESENTATIVES OR ATTORNEYS) TO DISCLOSE ANY INFORMATION IN CONNECTION WITH THE EXECUTION OF THIS AGREEMENT OR ITS PREPARATION; IT BEING**

**EXPRESSLY UNDERSTOOD THAT NO PARTY SHALL EVER ASSERT ANY FAILURE TO DISCLOSE INFORMATION ON THE PART OF ANOTHER PARTY AS A GROUND FOR CHALLENGING THIS AGREEMENT.**

The supreme court upheld a disclaimer of reliance in *Forest Oil* that stated that the parties were not "relying upon any statement or any representation of any agent of the parties being released" and that they were each "relying on his, her, or its own judgment." 268 S.W.3d at 54 n.4. The court also upheld a disclaimer of reliance in *Schlumberger* that stated, "[N]one of us is relying upon any statement or representation by any agent of the parties being released hereby," and, "Each of us is relying on his or her own judgment." 959 S.W.2d at 180. We upheld a disclaimer of reliance in *Druce* that stated that the appellee would "inspect the property" and would "rely solely on its own investigation of the property and not on any information provided or to be provided by seller." 369 S.W.3d at 371.

In contrast, the supreme court held in *Italian Cowboy* that a clause stating that the "[t]enant acknowledges that neither Landlord nor Landlord's agents, employees or contractors have made any representations or promises . . . except as expressly set forth herein" was a merger clause and not enforceable as a disclaimer of reliance. 341 S.W.3d at 336. The court specifically noted that, unlike the clause in that case, the clauses at issue in *Forest Oil* and *Schlumberger* contained "clear and unequivocal language expressly disclaiming reliance." *Id.*

16

The clauses here state that Kelly "did not rely and has not relied upon any representation or statement" and that "[n]one of the parties are relying upon a legal duty . . . to disclose any information."  These clauses contain "clear and unequivocal" language expressly disclaiming reliance like those upheld in *Forest Oil*, *Schlumberger*, and *Druce*.  *See* 268 S.W.3d at 54 n.4; 959 S.W.2d at 180; 369 S.W.3d at 371.

Because the 2001 settlement agreement's reliance disclaimer uses clear and unequivocal language, we will review it using the *Forest Oil* factors.  *See Italian Cowboy*, 341 S.W.3d at 337 n.8.

Kelly stated that he was told that the language in the 2001 settlement agreement was "boilerplate."  However, the issue that became the subject of the current dispute—the amount Tim and Kevin received from the sale—was specifically discussed during their negotiations.  Tim and Kevin told Kelly they received $1,000,000 each from the sale.  In response, Kelly inquired about the 10-Q that showed that Berry had paid $25,000,000 for Pescor, and Tim wrote out how the sale proceeds were distributed.  The record reflects that Kelly was engaged in a lawsuit against Tim and Kevin in which he alleged fraud, he doubted Tim and Kevin enough to question them about the $25,000,000 purchase price, and the parties discussed the disposition of the purchase price.  Even if they did not specifically negotiate the disclaimer of reliance, Kelly still signed a waiver-of-reliance provision after specifically discussing a material issue with Tim and Kevin.  *See Forest Oil*, 268 S.W.3d at 58.

17

Kelly, the complaining party, was represented by counsel. *See id.* at 60. Although Kelly alleged that he signed the agreement without his counsel present and was unaware of the disclaimer, he stated in his deposition that he was represented by counsel during both the lawsuit and settlement negotiations and that his counsel had approved the 2001 settlement agreement.

The settlement negotiation was an arm's length transaction in light of the fact that the parties were negotiating it to end adverse litigation and, as addressed above, no fiduciary relationship existed between them. *See id.* Further, Kelly was knowledgeable in business matters. *See id.* He had been the director of operations for Pescor for three years, the vice-president of operations for Pescor for nine years, and on the board of directors at Pescor for nine years. Finally, the disclaimer was in a "once and for all" settlement agreement, which further supports the disclaimer's enforceability. *See Italian Cowboy*, 341 S.W.3d at 336.

After analyzing the *Forest Oil* factors, we conclude the disclaimer of reliance in the 2001 settlement agreement between Kelly, Tim, and Kevin is enforceable and negates the reliance element in both Kelly's fraud-based and negligent misrepresentation claims. Therefore, summary judgment on Kelly's fraudulent concealment, fraudulent inducement, common-law fraud, and negligent misrepresentation claims as to the 2001 settlement agreement was proper. We overrule this portion of Kelly's sole issue.

18

## D. Release in the Settlement Agreement

In his fourth sub-issue, Kelly contends that the trial court erred by granting summary judgment on the defense of release.

Kelly's sole argument against Tim and Kevin's defense of release is that it was negated by fraud. However, as discussed above, the disclaimer of reliance in the 2001 settlement agreement vitiates Kelly's fraud claims. *See Italian Cowboy*, 341 S.W.3d at 332. Therefore, the release in the 2001 settlement agreement was valid, and Kelly released his remaining claims for negligence and gross negligence. We overrule this portion of Kelly's sole issue. Having held that summary judgment was proper on all of Kelly's claims, we need not reach Kelly's remaining sub-issues. *See* Tex. R. App. P. 47.1.

## IV. Conclusion

Having overruled the dispositive portions of Kelly's sole issue, we affirm the trial court's judgment.

BOB MCCOY
JUSTICE

PANEL: LIVINGSTON, C.J.; MCCOY and GABRIEL, JJ.

DELIVERED: July 25, 2013