

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

---

No. 02-23-00450-CV

---

DUC X. PHAM AND PHOUNG K. DO PHAM, Appellants

V.

JOHN ARCHER AND ANDREA ARCHER, Appellees

---

On Appeal from the 17th District Court
Tarrant County, Texas
Trial Court No. 017-319937-20

---

Before Bassel, Womack, and Walker, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

## I. INTRODUCTION

Appellants Duc X. Pham and Phoung K. Do Pham sold a home located at 5108 Oak Lane in Arlington (the Property) to Appellees John Archer and Andrea Archer. Following the sale, the Property flooded on multiple occasions. The Archers filed suit against the Phams, complaining, among other things, that the Phams had fraudulently induced them to purchase the Property by failing to disclose prior flooding and drainage problems on the Property. A jury found in the Archers' favor, and the trial court signed a final judgment in accordance with the jury's verdict.

In four issues on appeal, the Phams argue that (1) the evidence is factually insufficient to demonstrate that the Archers carried their burden to avoid an "as-is" clause in the contract pertaining to the sale of the Property, (2) the trial court erred by denying their motion for judgment notwithstanding the verdict (JNOV), (3) the trial court "erred in denying [their] request to include the law of [the] 'as is' clause in the jury charge," and (4) the Archers cannot recover on their claim for unjust enrichment. We will hold that (1) the evidence is factually sufficient to support the Archers' statutory fraud and common-law fraud claims; (2) the trial court did not err by denying the Phams' motion for JNOV; (3) the Phams did not preserve their complaint regarding the jury charge, and in any event, the trial court did not abuse its discretion by refusing to give the Phams' proposed instruction regarding the "as is" clause; and (4) we need not reach the Phams' complaint regarding the Archers' claim

for unjust enrichment due to our holdings with respect to the Archers' statutory fraud and common-law fraud claims. Accordingly, we will affirm the trial court's judgment.

## II. BACKGROUND

**A. The Phams' Sale of the Property to the Archers, the Contract, the "As-Is" Clause, the Seller's Disclosure, and the Archers' Reliance on the Seller's Disclosure**

The Property was built in 1999. In 2012, the Phams purchased the Property.[1] At the time of that purchase, the Property's backyard contained an in-ground swimming pool and a retaining wall adjacent to the swimming pool.

In 2018, the Phams sold the Property to the Archers. The parties executed a contract pertaining to the sale (the Contract) entitled "One to Four Family Residential Contract (Resale)," using a form promulgated by the Texas Real Estate Commission. The Contract provided that the closing date for the sale of the Property was July 31, 2018. Notably, the Contract included the following "as-is" clause:

> ACCEPTANCE OF PROPERTY CONDITION: "As Is" means the present condition of the Property with any and all defects and without warranty except for the warranties of title and the warranties in this contract. Buyer's agreement to accept the Property As Is under [this contract] does not preclude Buyer from inspecting the Property . . . , from negotiating repairs or treatments in a subsequent amendment, or from terminating this contract during the Option Period, if any. . . . Buyer accepts the Property As Is.

---

[1]It is unclear from the record how many parties owned the Property prior to the Phams.

3

The Contract also indicated that the Archers had received the "Seller's Disclosure Notice Pursuant to §[ ]5.008, Texas Property Code" (the Seller's Disclosure). *See* Tex. Prop. Code Ann. § 5.008. The Seller's Disclosure was signed by the Phams on June 5, 2018. The Seller's Disclosure stated, "This notice is a disclosure of Seller's knowledge of the condition of the Property as of the date signed by Seller and is not a substitute for any inspections or warranties the Buyer may wish to obtain. It is not a warranty of any kind by Seller."

In the Seller's Disclosure, the Phams represented that, to their knowledge, the Property did not have any of the following conditions: "Improper Drainage," "Previous Flooding into the Structures," "Previous Flooding onto the Property," "Water Penetration," or "Wood Rot." Just above the Phams' signatures, the Seller's Disclosure stated, "Seller acknowledges that the statements in this notice are true to the best of Seller's belief and that no person, including the broker(s), has instructed or influenced Seller to provide inaccurate information or to omit any material information." Mr. Archer testified that he and his wife had relied on the Seller's Disclosure in making their decision to purchase the Property. Indeed, Mr. Archer stated, "[I]f we knew about the previous flooding onto the [P]roperty or into the [P]roperty, we would not have purchased this home."

## B. The Archers' Inspections of the Property

The Contract authorized the Archers to have the Property inspected prior to closing. The Archers hired Westcliff Inspection Services, LLC to inspect the

4

Property.  Jeff Blowers, an inspector assigned by Westcliff, inspected the Property on June 28, 2018, and he issued a forty-eight-page inspection report (the First Inspection Report).  In the First Inspection Report, Blowers indicated that the temperature was ninety-four degrees at the time of inspection and that soil conditions were dry.

As pertinent to the claims in this lawsuit, the First Inspection Report noted the following with respect to the Property:

- As to "Grading and Drainage," the First Inspection Report stated, "Gutter downspouts should divert water 5 feet away from foundation.  Recommend extensions to move water run-off away from foundation where possible.  Water may collect and pool as indicated in circled areas of picture(s).[2]  The recommendation is monitor this during extreme weather events.  A landscape professional should be consulted if pooling is observed."

- As to "Other – Comments," the First Inspection Report stated, in pertinent part, "Observed cracking along mortar joints in stone retaining wall.  Monitor for any further movement over time."

At trial, Blowers testified that the retaining wall in the backyard was "in relatively good condition," even though some places had "relatively minor cracking in it."  Blowers testified that such minor cracking was not uncommon and "there wasn't anything to lead [him] to think that that wall would leak through the mortar joints on it."  Blowers also stated that he observed nothing during his inspection that "would

---

[2]The "Grading and Drainage" section of the First Inspection Report included six photographs.  Mr. Archer testified that none of the six photographs depicted the swimming pool.  While one of the photographs depicted a retaining wall, Mr. Archer testified that the retaining wall depicted in the photograph was located in the front of the house and was not the retaining wall in the backyard.

alert a potential buyer that there's been flooding and drainage issues in this backyard." Blowers testified that he did not test the drainage on the Property, nor did he observe the top of the backyard retaining wall.

The Contract included a lease-back agreement through which the parties agreed that the Phams could continue to reside in the Property for seven days after closing. The Archers had the Property inspected a second time after the conclusion of that lease-back agreement.[3] Blowers conducted both inspections and testified that the second inspection covered some of the items mentioned in the First Inspection Report for which repair work had been done. Blowers made a ten-page report following the second inspection of the Property (the Second Inspection Report).[4] Unlike the First Inspection Report, the Second Inspection Report did not mention "Grading and Drainage," nor did it mention any retaining wall on the Property.

## C. The Property's Flooding Following the Sale

The Archers did not move into the Property immediately after closing. They were relocating to Texas from Iowa, and Ms. Archer remained in Iowa after closing. Mr. Archer, who had started a new job in Texas in July 2018, lived in an extended-stay hotel following closing.

---

[3]Mr. Archer testified that the second inspection occurred around August 15, 2018.

[4]The Second Inspection Report did not reflect the date on which the second inspection occurred.

On September 8, 2018, while Mr. Archer was visiting the Property, it was raining. Mr. Archer observed the backyard "being fully flooded from rainwater coming through the [retaining] wall and over the [retaining] wall." Runoff from the rain entered the pool, darkening the pool's water, and the water rose over the pool's edge. Despite the efforts of Mr. Archer and a neighbor to divert the water's flow, water entered the house. Mr. Archer estimated that the water came "10–15 feet into the house."[5]

Only two weeks later, on September 22, 2018, the Property again flooded during a rainstorm. Mr. Archer testified that water and mud entered the pool, and that once again, water came into the house.[6]

## D. Evidence of Prior Flooding on the Property

At trial, evidence was presented—through both witnesses and exhibits—regarding prior flooding on the Property before the Archers' purchase. We now detail that evidence.

---

[5]Several videos taken by Mr. Archer of the September 8 flooding were admitted into evidence at trial. Those videos reflect significant flooding to the Property's backyard and depict the pool overflowing.

[6]Several videos taken by Mr. Archer of the September 22 flooding were admitted into evidence at trial. Once again, those videos reflect significant flooding to the Property's backyard and depict the pool overflowing.

## 1. Evidence Regarding Prior Drainage Work Done on the Property by Andy's Sprinkler

Ms. Pham testified that in 2013—the year after the Phams had purchased the Property—she called Andy's Sprinkler to come out to the Property because of drainage issues in the backyard, including issues with "standing water." An invoice from Andy's Sprinkler dated May 20, 2013, contains the following note regarding the "Work Description": "investigated drainage[,] cleaned out drain on right back side of house[,] cleaned out drain and located exit for left back side drain[,] [r]eturning at later date to extend drain to street." A later invoice dated June 4, 2013, includes the following note regarding the "Work Description": "Extended drain as per agreement."

## 2. Evidence From Scott Dailey Regarding Drainage Problems on the Property and Ms. Pham's Statement to Him Concerning Past Water Intrusion Into the Home

Scott Dailey, the owner of Ace Pool Service, testified that the Phams had called him out to the Property "two or three times" to perform work on the Property's pool. On one of those occasions, Dailey had a conversation with Ms. Pham about runoff and water issues in the backyard. According to Dailey, Ms. Pham told him that when it rained, "water would overflow the pool and get into the house." He later reiterated, "I just remember the conversation where the pool filled up and then it flowed into the house." Dailey testified that he recommended that Ms. Pham add drainage to the

backyard.[7]  Dailey stated that he gave Ms. Pham the phone number of an individual—Robert Cagle—who handled drainage issues like those in the Phams' yard.

Ms. Pham testified that she had called Dailey in or around 2015 to clean the pool because there was "dirt in the pool."  Ms. Pham stated that she did not ask Dailey to inspect any drainage problems on the Property, although she acknowledged that while Dailey was at the Property, he told her that the backyard retaining wall lacked drainage and that she needed to add drainage to it.  According to Ms. Pham, Dailey brought a "friend" with him to the Property the next day to look at the Property's drainage.[8]  After inspecting the Property, Dailey and the "friend" told Ms. Pham that the backyard retaining wall lacked drainage.  Ms. Pham said that Dailey and his "friend" told her that she needed "to dig . . . ditches or something under [the] retaining wall."  According to Ms. Pham, Dailey never presented her with a quote regarding adding drainage to the backyard.  Ms. Pham testified that she never told Dailey that water had entered the house from the backyard, although she admitted that on one occasion water "came up over the lip of the pool."

---

[7]Dailey testified, "And so I told her, 'You need some drainage and then you've got to cut it down and slope it down and make it come and pour off down the side of the yard.'  I said, 'That's all you've got to do to fix that.'"

[8]It is unclear from the record if this "friend" was Cagle.  Dailey testified that he did not recall ever visiting the Property with Cagle, although he stated that he thought that Cagle had gone to the Property to inspect it.

### 3. Evidence from Carl Stewart Regarding the Backyard Retaining Wall

Carl Stewart, the owner of Urban Oasis Outdoor Living, was hired by the Archers following the September 2018 flooding to correct the Property's drainage problems. Stewart determined that the Archers needed to replace the backyard retaining wall and add drainage around the pool. Stewart testified regarding the cause of the problems with the backyard retaining wall. He stated that his inspection had showed that the mortar cracks in the backyard retaining wall were caused from "water damage over a period of time"—"the water kind of eating away at it and washing out the soil and getting behind the wall." Stewart also stated that it looked like the retaining wall had previously been repaired.

### 4. Evidence from Sam Shank Regarding Water Damage Inside the Home

Sam Shank, the owner of Aspenwood Homes, testified that he remodeled the interior of the Property in 2019. Shank averred that he observed damage to the floor in the master bedroom—a room that was located in the rear of the home—that was "consistent with water damage." Shank also noticed that there was water damage in the family room, noting that it contained "mold on the sheetrock." According to Shank, for there to be "mold on the face of the sheetrock," the sheetrock "would have to have had standing water around it to absorb up into the studs and get into the sheetrock." Shank also testified that he observed evidence of "water intrusion" in "a small area along the back" of the house.

## 5. Evidence from Jeff Hunt—the Archers' Expert Witness—Regarding Past Flooding and Water Intrusion on the Property

The Archers hired Jeff Hunt as an expert witness. Hunt has a Bachelor of Science degree in building construction and a Master of Business Administration degree, and he has spent decades working in construction and consulting on construction projects. Hunt reviewed photographs of the Property, reviewed aerial imagery of the surrounding area, and analyzed historical weather data. He testified that it was "more likely than not" that the Property had sustained water intrusion and flooding events prior to the Archers' purchase of the Property. Hunt also indicated that the rainfall in the area on September 8, 2018, and September 22, 2018, was not unusually high.

## E. Procedural Background

The Archers filed suit against the Phams, alleging claims of statutory fraud, common-law fraud, and unjust enrichment. The case proceeded to a seven-day jury trial. As recounted above, numerous witnesses testified at trial regarding the Contract, the Seller's Disclosure, and the flooding and drainage issues on the Property.

At the end of trial, the jury answered "yes" to questions regarding whether (1) the Phams had committed fraud against the Archers in connection with a real estate transaction, (2) the Phams had committed common-law fraud against the Archers, and (3) the Phams had been unjustly enriched by the sale of the Property to

11

the Archers. The trial court later signed a final judgment awarding the Archers, among other things, actual damages of $221,000.

The Phams filed a motion for JNOV, which the trial court denied. The Phams also filed a motion for new trial, which was overruled by operation of law. *See* Tex. R. Civ. P. 329b(c). This appeal followed.

### III. DISCUSSION

### A. The Phams' Factual-Sufficiency Complaint Regarding the "As Is" Clause

In their first issue, the Phams argue that "[t]he evidence [is] factually insufficient to demonstrate that [the Archers] carried their burden to avoid the 'as-is' clause in the contract for the sale of the Property."

#### 1. Standard of Review

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all the pertinent record evidence, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). When conducting a factual-sufficiency review, we do not substitute our judgment for that of the factfinder. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). The

factfinder is the sole judge of the witnesses' credibility and the weight to be given to their testimony. *Id.*

## 2. Applicable Law

A valid "as is" agreement prevents a buyer from holding a seller liable if the thing sold turns out to be worth less than the price that the buyer paid. *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 161 (Tex. 1995); *Volmich v. Neiman*, No. 02-12-00050-CV, 2013 WL 978770, at *3 (Tex. App.—Fort Worth Mar. 14, 2013, no pet.) (mem. op.). "By agreeing to purchase something 'as is', a buyer agrees to make his own appraisal of the bargain and to accept the risk that he may be wrong." *Prudential Ins. Co. of Am.*, 896 S.W.2d at 161. "The sole cause of a buyer's injury in such circumstances, by his own admission, is the buyer himself." *Id.* With an "as is" agreement, "[t]he seller gives no assurances, express or implied, concerning the value or condition of the thing sold." *Id.*

An "as is" clause may not be enforced when the buyer is induced to enter into a contract by a seller's fraudulent representation or concealment of information. *Millhollon v. Douglas*, No. 02-18-00105-CV, 2019 WL 6334695, at *17 (Tex. App.—Fort Worth Nov. 27, 2019, pet. denied) (mem. op.) (citing *Prudential Ins. Co. of Am.*, 896 S.W.2d at 162). Indeed, "[a] seller cannot have it both ways: he cannot assure the buyer of the condition of a thing to obtain the buyer's agreement to purchase 'as is', and then disavow the assurance which procured the 'as is' agreement." *Prudential Ins. Co. of Am.*, 896 S.W.2d at 162. Even absent fraudulent inducement, an "as is" clause

13

still may not be enforceable depending on the nature of the transaction and the totality of the circumstances surrounding the agreement.[9] *Millhollon*, 2019 WL 6334695, at *17.

Under Section 5.008 of the Texas Property Code, a seller of residential real property is required to give the purchaser of the property written notice concerning his knowledge of the condition of the property. *See* Tex. Prop. Code Ann. § 5.008. The written notice must contain, "at a minimum, all of the items in the notice prescribed by [that] section." *Id.* § 5.008(a). The notice "shall be completed to the best of [the] seller's belief and knowledge as of the date the notice is completed and signed by the seller." *Id.* § 5.008(d). A seller, however, has no duty to disclose facts that he does not know, nor is a seller liable for failing to disclose what he only should have known. *Prudential Ins. Co. of Am.*, 896 S.W.2d at 162.

"Texas courts consistently have concluded that a buyer's independent inspection precludes a showing of causation and reliance if it reveals to the buyer the information that the seller allegedly failed to disclose." *Birnbaum v. Atwell*, No. 01-14-00556-CV, 2015 WL 4967057, at *8 (Tex. App.—Houston [1st Dist.] Aug. 20, 2015,

---

[9]In considering the totality of the circumstances, courts consider, among other things, (1) the sophistication of the parties and whether they were represented by counsel, (2) whether the contract was an arm's-length transaction, (3) the relative bargaining power of the parties and whether the contractual language was freely negotiated, and (4) whether the language was an important part of the parties' bargain as opposed to being a "boiler-plate" provision. *Prudential Ins. Co. of Am.*, 896 S.W.2d at 162; *Naquin v. Cellio*, No. 02-16-00117-CV, 2017 WL 2178873, at *3 (Tex. App.—Fort Worth May 18, 2017, no pet.) (mem. op.).

pet. denied) (mem. op.); *see Ivy v. Garcia*, No. 03-18-00545-CV, 2019 WL 3756483, at *3 (Tex. App.—Austin Aug. 9, 2019, no pet.) (mem. op.) (similar). "This is consistent with the principle that a party who has actual knowledge of specific facts cannot have [justifiably] relied on a misrepresentation of the same facts." *Williams v. Dardenne*, 345 S.W.3d 118, 126 (Tex. App.—Houston [1st Dist.] 2011, pet. denied); *see Mead v. Gray*, No. 02-16-00177-CV, 2017 WL 1738066, at *2 (Tex. App.—Fort Worth May 4, 2017, pet. denied) (mem. op.). In determining whether a buyer's independent inspection conclusively negates reliance and causation, courts look to whether the buyer possessed the same information and knowledge as the seller. *Mead*, 2017 WL 1738066, at *2.

### 3. Analysis

The parties both point us to four prior opinions of our court to aid in our analysis of the Phams' first issue. *See Millhollon*, 2019 WL 6334695; *Naquin*, 2017 WL 2178873; *Mead*, 2017 WL 1738066; *Volmich*, 2013 WL 978770.

#### a. *Volmich*

In *Volmich*, the buyers of a home sued the sellers of the home when the home's roof began leaking after the purchase. 2013 WL 978770, at *1. The sellers moved for summary judgment, contending that the buyers had waived the right to claim the alleged damages due to an "as-is" clause in the contract and because the buyers had obtained an independent inspection of the property prior to the sale. *Id.* The trial court granted summary judgment to the sellers. *Id.* at *2.

15

On appeal, the buyers argued that they should not be bound by the "as is" clause because they were fraudulently induced to enter the contract due to the sellers' failure to disclose defects with the home's roof. *Id.* We rejected that argument, holding that the buyers had presented no evidence that the sellers knew of the alleged roof leak when they had completed the seller's disclosure. *Id.* at *7. We further held that even if there had been evidence that the sellers knew of the alleged roof leak when they had completed the seller's disclosure, the independent inspection obtained by the buyers prior to the sale "revealed numerous existing or past problems with the home, including previous roof repairs, leaks, and moisture damage and moisture-related deterioration throughout the house." *Id.* We made clear that "[w]e do not hold that an independent inspection will always bar [Deceptive Trade Practices Act] and fraudulent inducement claims" but that "under the facts and circumstances of this case"—where the inspection revealed the specific conditions that the sellers allegedly failed to disclose—the buyers had met their burden. *Id.* at *8. Accordingly, we affirmed the trial court's grant of summary judgment. *Id.*

### b. *Mead*

In *Mead*, the buyers of a home sued the sellers of the home after they observed foundation problems in the home following the purchase. 2017 WL 1738066, at *1. The sellers moved for summary judgment, arguing that the subject contract contained an "as is" clause and that the buyers had obtained their own independent inspection

16

of the home that revealed the home's foundation problems. *Id.* The trial court granted summary judgment to the sellers. *Id.*

On appeal, the buyers argued that summary judgment was improper because the inspection of their home did not disclose problems with the home's foundation and because the sellers had "actively concealed information concerning prior foundation problems by failing to disclose prior problems on their 'Seller's Disclosure Notice.'" *Id.* at *3. Our court rejected the buyers' arguments. *Id.* at *4. We stated that the "deficiencies noted in [the buyers'] inspector's report are the same problems [the buyers] claim they did not know about and first discovered only after moving into the house." *Id.* We also noted that the buyers did not "point to any specific item in, or portion of, the Seller's Disclosure Notice that they allege was incorrectly or incompletely filled out by [the sellers]." *Id.* Accordingly, we affirmed the trial court's grant of summary judgment. *Id.* at *6.

### c. *Naquin*

In *Naquin*, a buyer of a home sued the sellers of the home after she discovered problems with "the plumbing and septic systems, the pool house, an unpermitted sprinkler system, and improper drainage." 2017 WL 2178873, at *1. The sellers moved for summary judgment, contending that the buyer had "contractually accepted the property 'in its present condition' at the time of the sale, thereby waiving the right to claim alleged damages." *Id.* The sellers also argued that the buyer could not establish reliance and causation for her claims because she had hired an independent

inspector "whose report disclosed problems in the very areas [the buyer] complained about in her petition." *Id.* The trial court granted summary judgment to the sellers. *Id.* at *2.

On appeal, the buyer argued that the contract's "as is" language and the independent inspection of her home did not supersede any alleged misrepresentations by the sellers. *Id.* We rejected that argument, holding that the inspection "revealed numerous existing or past problems with the home, including problems with the home's structural systems, its grading and drainage systems, and its sprinkler system" and that it "also revealed that the pool side commode needed further evaluation and possible correction." *Id.* at *5. Because the issues revealed by the inspection were the same issues that the buyer later complained about in her lawsuit, we held that "the independent inspection that [the buyer] commissioned and reviewed before deciding to purchase the home supersedes any alleged misrepresentation or failure to disclose by [the sellers]." *Id.* Accordingly, we affirmed the trial court's grant of summary judgment. *Id.*

### d. *Millhollon*

In *Milhollon*, the buyers of a home sued the sellers of the home after they began experiencing problems with the home's plumbing, septic system, and drainage. 2019 WL 6334695, at *7, *10. The sellers had previously experienced similar problems with the home. *Id.* at *1–5. Despite their awareness of the home's problems, the sellers signed a seller's disclosure in which they indicated that they were

18

not aware of any defects to the home's plumbing, septic system, or drainage. *Id.* at *5. The buyers of the home later obtained an independent inspection of the home—an inspection that had taken place on "a clear and sunny day towards the end of a month where virtually no rain fell." *Id.* at *21. The inspector did not find any plumbing problems with the home, other than some issues that the buyers did not complain about in their lawsuit. *Id.* In his report, the inspector noted that the inspection of the septic system was "limited to what is easily accessible/observable," and he "recommended that a reputable septic company be consulted." *Id.* at *6. An aerobic septic specialist later inspected the home's septic system and reported to the buyers that the "system [was] working fine." *Id.* As to drainage on the property, the inspector only noted "some minor issues with the home's gutters." *Id.* at *20. The buyer's lawsuit proceeded to trial, and a jury found that the sellers had committed statutory fraud against the buyers. *Id.* at *13.

On appeal, the sellers argued that the "as is" clause in the sales contract prevented the buyers from recovering damages and that the buyers could not demonstrate reliance or causation because they had the property inspected prior to the purchase. *Id.* at *14. We rejected those arguments. *Id.* at *19–21. We held that there was sufficient evidence in the record from which the jury could have found that the sellers had knowingly made inaccurate disclosures to induce the buyers into purchasing the home. *Id.* at *19. We also rejected the sellers' suggestion that *Volmich* and *Naquin* stood for the proposition that, "*regardless of the result of his investigation*, the

19

buyer's decision to undertake such an investigation indicates that he or she is not relying on the seller's representations about the property." *Id.* at *20. Instead, we held that "it is the investigation into the *same* matters covered by the false or fraudulent representations that breaks the chain of causation and reliance on those representations." *Id.* (first citing *Naquin*, 2017 WL 2178873, at *4; and then citing *Volmich*, 2013 WL 978770, at *5).

We stated that "because [the buyers] did not know the property's history of drainage and septic system problems, they did not know to direct their home inspector or septic system specialist to look for specific issues with the property." *Id.* And while their home inspector "did note some minor issues with the home's gutters, [the buyers] did not know to ask him to determine how water drained from the backyard, and the lack of rainfall precluded the subsequent drainage and septic issues from arising for either of their inspectors or from their firsthand discovery prior to closing." *Id.* Accordingly, we rejected the sellers' argument that the buyers had introduced no evidence to prove that they had relied on the seller's disclosure rather than their own independent inspection. *Id.* at *21.

### e. What we glean from our prior opinions and our ultimate holding with respect to the Phams' first issue

From these prior opinions, we glean two overriding principles: (1) that an "as is" clause may not be enforced when a buyer is induced to enter into a contract by a seller's fraudulent representation or concealment of information and (2) that a buyer's

20

independent inspection will preclude the buyer's showing of reliance and causation if the inspection reveals the same information that the seller allegedly failed to disclose.

Applying those principles here, we hold that (1) the Contract's "as is" clause should not be enforced against the Archers because they were induced into entering the Contract by the Phams' failure to disclose their knowledge of the Property's drainage and flooding issues, and (2) the two inspections performed on the Property prior to the sale do not preclude the Archers from showing reliance and causation because the inspections did not reveal the same information that the Phams had failed to disclose.

In reaching that holding, we have considered the entirety of the record, and are particularly mindful of the following:

- In the Seller's Disclosure, the Phams represented that the Property did not have any of the following conditions: "Improper Drainage," "Previous Flooding into the Structures," "Previous Flooding onto the Property," "Water Penetration," or "Wood Rot."

- Ms. Pham admitted that she had called Andy's Sprinkler onto the Property in 2013 because of drainage issues in the backyard, including issues with "standing water."

- Dailey—the owner of Ace Pool Service—testified that he had spoken to Ms. Pham about "runoff and water issues in the backyard" and that Ms. Pham had told him that when it rained, "water would overflow the pool and get into the house."

- Dailey recommended that Ms. Pham add drainage to the backyard.

21

- While Ms. Pham denied telling Dailey that water had ever entered the house from the backyard, she admitted that Dailey had told her that she needed to add drainage to the backyard retaining wall.

- Stewart—who was hired by the Archers to correct the Property's drainage problems—testified that the problem with the backyard retaining wall was caused "from water damage over a period of time."

- Shank—who was hired by the Archers to remodel the interior of the Property—testified that he observed water damage to the home in the family room and in the master bedroom.

- Hunt—the Archers' expert witness—testified that it was "more likely than not" that the Property had sustained water intrusion and flooding events prior to the Archers' purchase of the Property.[10]

- Mr. Archer testified that he and his wife had relied on the representations made by the Phams in the Seller's disclosure, noting, "[I]f we knew about the previous flooding onto the [P]roperty or into the [P]roperty, we would not have purchased this home."

- When Blowers performed his first inspection of the Property, it was ninety-four degrees outside, and the soil conditions were dry.

- While Blowers observed "some places where there was relatively minor cracking" in the backyard retaining wall, he stated that such "minor cracking [was] not uncommon," that "there wasn't anything to lead [him] to think that that wall would leak through the mortar joints on it," and that he observed nothing during his inspection that "would alert a potential buyer that there's been flooding and drainage issues in this backyard."

---

[10]While acknowledging that Hunt and other trial witnesses spoke about evidence of water intrusion and flooding, the Phams contend in their brief that the evidence does not demonstrate "*when* the damage from water occurred" to the Property. The Phams suggest that the damage could have occurred either before they had purchased the Property or after the Archers had purchased the Property. But that argument ignores the evidence that Ms. Pham knew about the backyard's drainage problems, and in particular, it ignores Dailey's testimony that Ms. Pham had told him that when it rained, "water would overflow the pool and get into the house."

- Blowers stated that he did not test the drainage on the Property, nor did he observe the top of the backyard retaining wall.

- While the First Inspection Report mentioned that "[w]ater may collect and pool as indicated in circled areas of picture(s)," none of the pictures were of the swimming pool or the backyard retaining wall.

- The Second Inspection Report did not mention "Grading and Drainage," nor did it mention any retaining wall on the Property.

After considering and weighing all of the pertinent record evidence, and after deferring to the factfinder on issues concerning the witnesses' credibility and the weight to be given to their testimony, we hold that the evidence is factually sufficient to support the jury's findings that the Phams had committed fraud against the Archers in connection with a real estate transaction and that the Phams had committed common-law fraud against the Archers. *See Millhollon*, 2019 WL 6334695, at *19–21; *Naquin*, 2017 WL 2178873, at *5; *Mead*, 2017 WL 1738066, at *4; *Volmich*, 2013 WL 978770, at *7–8. We overrule the Phams' first issue.

## B. The Phams' Complaint Regarding the Trial Court's Denial of Their Motion for JNOV

In their second issue, the Phams argue that the trial court erred by denying their motion for JNOV.

### 1. Standard of Review

We review the denial of a motion for JNOV under a legal-sufficiency or "no-evidence" standard. *Bank of Am., N.A. v. Eisenhauer*, 474 S.W.3d 264, 265 (Tex. 2015);

23

*Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009). Under that standard, we credit evidence favoring the jury verdict if reasonable jurors could, and we disregard contrary evidence unless reasonable jurors could not. *Tanner*, 289 S.W.3d at 830. "[E]very reasonable inference deducible from the evidence is to be indulged in" to support the jury's finding. *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017) (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)); *see City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We will uphold the denial of a JNOV if more than a scintilla of competent evidence supports the verdict. *Tanner*, 289 S.W.3d at 830; *Wal-Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex. 2003). Evidence exceeds a scintilla when it rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Schindler Elevator Corp. v. Ceasar*, 670 S.W.3d 577, 584 (Tex. 2023); *Havner*, 953 S.W.2d at 711.

### 2. Analysis

The Phams argue that the trial court erred by denying their motion for JNOV for the same reasons that they argue in their first issue. Namely, the Phams argue,

> Here, as Appellants set out in their first issue, Appellees had an independent inspection completed. The inspector reviewed the retaining wall and found deficiencies and recommended that the wall be monitored. But the inspector testified that the retaining wall was "in relatively good condition." This is exactly the circumstance in which this Court has held that the buyers' reliance on the sellers' disclosure is severed by the later and independent investigation. *Volmich*, 2013 WL 987770, at *2–*5; *Mead*, 2017 WL 1738006, at *3; *Naquin*, 2017 WL 2178873, at *1–*3. Accordingly, the evidence established Appellants'

24

right [to] judgment and negated Appellees' claim for reliance[,] and the trial court erred in not granting the JNOV. *Prudential*, 29 S.W.3d at 77.[11]

But, as discussed in our analysis of the Phams' first issue, we reject the argument that Blowers' two inspections of the Property preclude the Archers from showing reliance and causation because those inspections did not reveal the same information that the Phams had failed to disclose. *See Millhollon*, 2019 WL 6334695, at *19–21; *Naquin*, 2017 WL 2178873, at *5; *Mead*, 2017 WL 1738066, at *4; *Volmich*, 2013 WL 978770, at *7–8. Thus, there is more than a scintilla of competent evidence to support the jury's verdict, and the trial court did not err by denying the Phams' motion for JNOV. We overrule the Phams' second issue.

## C. The Phams' Jury-Charge Complaint Regarding the "As Is" Clause

In their third issue, the Phams argue that the trial court "erred in denying [their] request to include the law of [the] 'as is' clause in the jury charge."

### 1. Standard of Review

We review a trial court's decision to submit or refuse a particular instruction for an abuse of discretion. *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000); *see City of The Colony v. N. Tex. Mun. Water Dist.*, 272 S.W.3d 699, 746 (Tex. App.—Fort Worth 2008, pet. dism'd). A trial court has considerable discretion to determine proper jury instructions. *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012). A trial court has the duty to submit only those questions, instructions, and definitions raised by the

---

[11]We have omitted the Phams' record references contained in this quote.

pleadings and the evidence. *Id.* at 693; *Harris County v. Smith*, 96 S.W.3d 230, 236 (Tex. 2002). An error in a jury charge does not warrant reversal unless the error probably caused the rendition of an improper judgment or probably prevented the appealing party from presenting the case to the court of appeals. *Horton v. Kansas City S. Ry. Co.*, 692 S.W.3d 112, 137–38 (Tex. 2024); *see* Tex. R. App. P. 44.1(a). Pursuant to Texas Rule of Civil Procedure 278, the "[f]ailure to submit a definition or instruction shall not be deemed a ground for reversal of the judgment unless a substantially correct definition or instruction has been requested in writing and tendered by the party complaining of the judgment." Tex. R. Civ. P. 278.

## 2. Analysis

### a. Preservation

We begin our analysis with a discussion of whether the Phams have preserved this complaint.

Generally, to preserve a complaint for appellate review, a party must present to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if not apparent from the request's, objection's, or motion's context. Tex. R. App. P. 33.1(a)(1)(A); *see also* Tex. R. Evid. 103(a)(1). If a party fails to do this, error is not preserved. *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g). The complaint on appeal must match that presented in the trial court. *In re J.C.*, 594 S.W.3d 466, 473 (Tex. App.—Fort Worth 2019, no pet.); *see Banda v. Garcia*, 955 S.W.2d 270, 272 (Tex. 1997). An appellate court cannot reverse based on

26

a complaint not raised in the trial court, *Banda*, 955 S.W.2d at 272, nor can it reverse on "unassigned error"—that is, a ground not presented in the appellate briefs, *Pat Baker Co. v. Wilson*, 971 S.W.2d 447, 450 (Tex. 1998). *See* Tex. R. App. P. 53.2(f); *Sonat Expl. Co. v. Cudd Pressure Control, Inc.*, 271 S.W.3d 228, 236 (Tex. 2008).

With respect to alleged errors in the jury charge, the complaining party must timely and plainly make the trial court aware of a jury-charge complaint and obtain a ruling. *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 43–44 (Tex. 2007); *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992) (op. on reh'g); *Faust v. BNSF Ry.*, 337 S.W.3d 325, 330 (Tex. App.—Fort Worth 2011, pet. denied); *see* Tex. R. Civ. P. 274. A party's request can serve as an objection for preservation purposes as long as the trial court is aware of the complaint and issues a ruling. *First Valley Bank of Los Fresnos v. Martin*, 144 S.W.3d 466, 474 (Tex. 2004); *Payne*, 838 S.W.2d at 240–41.

In their brief, the Phams do not point us to any actual instruction that they submitted to the trial court regarding the "as is" clause. Instead, they offer a smattering of generalities concerning the trial court's alleged failure to instruct the jury regarding the "as is" clause. To that end, the Phams state the following with respect to this issue: "[t]he trial court erred in denying Appellant's request to include the law of 'as is' clause in the jury charge"; "the charge does not reference the 'as is' clause and certainly does not give the jurors the law for an 'as is' clause"; "Appellant asks this Court to find the trial court erred in not including the 'as is' clause in the jury

27

charge"; "[r]equiring the court to submit the instruction satisfies established law"; "the decision not to submit the question was error"; "[t]he charge failed to include Appellants' principal legal defense"; and "the trial court erred by failing to include the instruction in the charge." Thus, while the Phams say the trial court erred by not submitting "the law," "the instruction," "the question," and "the legal defense," they do not point us to the specific language that they claim should have been included in the jury charge.

The only statement made in the Phams' brief that touches upon the preservation of this issue is a statement that "Appellants objected to the failure to include the 'as is' law in the jury charge." When looking at the referenced objection, we note that the Phams made the following objection at a hearing before the trial court concerning the charge: "Defendants do object to the charge for the failure to include any question related to the Plaintiffs' fraudulent inducement claim, and Defendants argue that the 'as is' clause of the contract precludes all of the liability claims in this case." But despite this objection, no specific instruction was requested.

We have also found that the record includes a proposed jury charge filed by the Phams. That filing contains the following proposed instruction, which was titled "Instruction Common Law Fraud Disclaimer of Reliance 'As Is' Contract":

> When parties enter into a contract and include language stating that the buyer agrees to take property "as is," that contract can negate reliance when:

28

1. the terms of the contract were negotiated, rather than boilerplate;

2. the parties dealt with each other in an arm's length transaction;

3. the parties were knowledgeable in business matters; and

4. the release language was clear.

However, we have not found any ruling by the trial court with respect to that requested instruction, nor have we found anything in the record to suggest that the trial court considered it. Accordingly, we hold that the Phams have not preserved any complaint with respect to this instruction. *See Ford Motor Co.*, 242 S.W.3d at 43–44; *Payne*, 838 S.W.2d at 241. And to the extent that the Phams are complaining about something other than this instruction as the basis for their jury-charge complaint, we hold that they have not preserved that complaint as they did not make the trial court aware of the complaint and obtain a ruling on the complaint. *See Ford Motor Co.*, 242 S.W.3d at 43–44; *Payne*, 838 S.W.2d at 241; *see also* Tex. R. App. P. 33.1(a).

### b. No Abuse of Discretion

Even if we construed the Phams' third issue to be a complaint that the trial court refused to submit the instruction contained in their proposed jury charge regarding the "as is" clause, and even if we assumed that the Phams had preserved that complaint, we would nevertheless hold that the trial court did not abuse its discretion by refusing the instruction. In this regard, as admitted by the Phams' appellate counsel during oral argument, the third and fourth subparts of the

29

instruction—that "the parties were knowledgeable in business matters" and that "the release language was clear"—were not proper. The Phams' appellate counsel candidly admitted that the third subpart did not relate to this dispute and that he "can't defend that." As to the fourth subpart, the Phams' appellate counsel admitted that "there's no release" in this case and that he was "stuck with what [he] had." Accordingly, because the proposed instruction was improper, the trial court did not abuse its discretion by denying it. *See Halmos v. Bombardier Aerospace Corp.*, 314 S.W.3d 606, 617 (Tex. App.—Dallas 2010, no pet.) ("An instruction that misstates the law as applicable to the facts or misleads the jury is improper."); *see also Matlock Place Apartments, L.P. v. Druce*, 369 S.W.3d 355, 382–83 (Tex. App.—Fort Worth 2012, pet. denied). We overrule the Phams' third issue.

## D. The Phams' Complaint Regarding the Archers' Recovery for Unjust Enrichment

In their fourth issue, the Phams argue that the Archers cannot recover for unjust enrichment because "there was a contract" and because they "did not know of and then fraudulently conceal information regarding the condition of the Property."

When a judgment rests on multiple theories of recovery, an appellate court need not address all causes of action if any one theory is valid. *Super Ventures, Inc. v. Chaudhry*, 501 S.W.3d 121, 135 (Tex. App.—Fort Worth 2016, no pet.); *EMC Mortg. Corp. v. Jones*, 252 S.W.3d 857, 870 (Tex. App.—Dallas 2008, no pet.) (op. on reh'g). Accordingly, we need not address this issue pertaining to the Archers' unjust

30

enrichment claim because, as we discussed in our analysis of the Phams' first issue, the evidence is sufficient to support the jury's finding on the Archers' statutory fraud and common-law fraud claims. *See Estate of Ewers*, 695 S.W.3d 603, 643 (Tex. App.—Houston [1st Dist.] 2024, no pet.) (op. on reh'g) ("Because the record supports the trial court's judgment on the appellees' fraud claim, we need not address their unjust-enrichment claim."); *Fulgham v. Allied Prop. and Cas. Ins. Co.*, No. 05-14-00189-CV, 2015 WL 3413525, at *4 (Tex. App.—Dallas May 28, 2015, no pet.) (mem. op.) (holding that it did not need to address appellant's complaint regarding the evidence supporting the jury's finding of unjust enrichment because the jury's finding of fraud was sufficient to support the judgment).

## IV. CONCLUSION

Having overruled the Phams' dispositive issues, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Delivered: January 16, 2025

31